IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REGIS ELLIS and BONNIE ELLIS, his wife,       ) ) ) Plaintiffs,     ) ) vs.     ) ) BEEMILLER, INC. and MKS SUPPLY, INC., t/d/b/a HI-POINT FIREARMS,   ) ) Defendants.     ) | Civil Action No. 09-1414 |

MEMORANDUM OPINION

BLOCH, District J.

Presently before the Court is Defendant Beemiller, Inc.'s and Defendant MKS Supply, Inc.'s Motion for Summary Judgment (Doc. No. 52). For the reasons set forth below, the Defendants' motion will be granted.

I.    **BACKGROUND**

This is a strict products liability case over which this Court has jurisdiction based on diversity of citizenship, pursuant to 28 U.S.C. § 1332.

As set forth in the complaint, Plaintiffs Regis and Bonnie Ellis, who are husband and wife, allege that Plaintiff-Husband's left hand was seriously injured after a Hi-Point model C9, 9mm pistol, which was manufactured and sold by Defendant Beemiller, Inc., and sold and distributed by Defendant MKS Supply, Inc., exploded in his hand even though Plaintiff-Husband never pulled the trigger.

Plaintiff-Husband ("Plaintiff") allegedly suffered serious injuries, including a comminuted fracture of the mid-portion of the left thumb metacarpal. As a result, Plaintiff has

allegedly (i) suffered great pain, suffering, mental anguish and embarrassment, (ii) undergone hospitalization and surgeries, (iii) incurred medical bills for treatment, (iv) been disfigured, (v) been unable to enjoy the ordinary pleasures of life, (vi) been unable to perform his normal daily activities including employment, and (vii) had his general health, strength, and vitality impaired. Plaintiff-Wife alleges that she suffered damages due to a loss of consortium.

Based upon the above, Plaintiffs allege that Defendants are strictly liable to Plaintiffs for their injuries sustained by the handgun (Counts I and IV), that Defendants are liable to Plaintiffs for breach of implied warranties (Counts III and VI) and that Defendants are liable for Plaintiff-Wife's loss of consortium (Counts X and XI).[1] On January 13, 2010, the Court approved Plaintiffs' notice dismissing without prejudice Federal Cartridge Company, a wholly owned subsidiary of ATK Corporation. See (Doc. No. 19).

## II.   **FACTUAL BACKGROUND**

The record as read in the light most favorable to Plaintiffs establishes the following background. On or about April 13, 2007, Plaintiff and his friend David Williams ("Williams") were at a campsite located at Raystown Lake, Pennsylvania, with several other individuals. The two men decided to look for an alternative fishing spot since their normal location had been designated for special needs fisherman and children. At some point, it was decided that the pair would find an area to fire the Hi-Point Model C9 9mm Luger handgun that Williams owned and brought to the campsite. Williams had purchased the gun new with 50 rounds of ammunition in approximately 2005 or 2006; he testified that he fired about 2 to 4 rounds of the ammunition in his backyard when he first purchased the gun and then cleaned it and placed it into a locked

---

[1] Plaintiffs indicated in their Brief in Opposition to Defendants' Motion for Summary Judgment that they are withdrawing their negligence claims and proceeding with a "strict liability case based upon the malfunction of the handgun and based upon breaches of implied warranties." See (Doc. No. 61) at 16.

drawer in his home afterwards.  Williams testified that the gun had not been touched until the date of the incident.

The two men traveled to a location behind a cabin where a tree stump was located by a creek.  Williams was the first to fire the gun and he shot one clip of eight rounds at a target which had been attached to a four-by-four stand near the water.  After Williams emptied out his clip, he inserted a loaded clip into the gun and handed it to Plaintiff with the safety on.  Plaintiff testified that after he was handed the gun, he took the safety off, held it with his right hand, and wrapped his left hand around his right hand and gun.  He then fired seven rounds at the target without any incident.

Prior to shooting his eighth and final round of ammunition, Plaintiff testified that he noticed that the slide of the gun did not fully go forward and was approximately 0.5 to 0.75 inches open.  At that point, he stated that he lowered the gun, took his finger off the trigger, and commented to Williams that he thought the gun was jammed.  Plaintiff took his left hand off the gun and was reaching towards the slide to try to clear the "jam" when all of a sudden the gun exploded in his hand.  Plaintiff testified that the gun exploded without him ever pulling or touching the trigger and that the bullet came out of the trigger housing/left side of the gun and not the muzzle.  He testified that when the gun "exploded," his left hand was parallel to the trigger housing and that the tip of his finger would have been taken off if it had been on the trigger when the explosion happened.  Plaintiff suffered a bullet injury to his left thumb as a result of the incident.[2]

---

[2] Although Plaintiff maintains that his injury was caused by a bullet, shrapnel, or fragment of the gun, the record contains absolutely no support for his claim that he was injured by anything other than a bullet.  See e.g., J.C. Blair Hospital Emergency Department Report (Doc. No. 56-4) at 2 ("This is a 43-year old male patient who experienced an accidental discharge of a 9-mm handgun, causing a bullet injury to the thenar area of the lend hand. He has an entry wound on

## III.   **APPLICABLE LEGAL STANDARD**

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48 (emphasis in original). The summary judgment standard requires the issue to be genuine, that is, one where a reasonable jury, based on the evidence presented, could return a verdict for the non-moving party with regard to that issue. See id. at 248. In addition, the disputed fact must be material, meaning it

---

the palmar surface and an exit wound behind the metacarpal bone . . . Diagnosis: Gunshot wound to the left hand."); Radiology Report (Doc. No. 56-4) at 3 (". . . 43 year old with gunshot wound to thumb."); Allegheny Chesapeake Physical Therapy Care Plan (Doc. No. 39-1) at 1 ("Patient reports suffering an accidental gunshot wound injury due to malfunction of the gun."); UPMC Plastic Surgery Report (Doc. No. 39-2) at 1 ("Status post gunshot wound to left thumb with left thumb metacarpal comminuted fracture . . . patient is a 45-year old right-hand dominant man who was manipulating a handgun when it discharged into the thenar eminence of the left hand . . . ."). Indeed, the only evidence in support of Plaintiff's position that he could have been injured by anything other than a bullet is his own testimony, where he stated, "I believe it was a round" but "[a]ll I knew is . . . when David picked the gun up and he looked at it, it looked as if the round come through the trigger housing and hit me. I don't know if it was a piece of the gun itself that hit me or the bullet." Plaintiff's Deposition (Doc. No. 56-2) at 4. Plaintiff's own testimony however is insufficient to support a finding that he was injured by shrapnel because Plaintiff is not a medical professional and is merely speculating as to the nature of his injury. The Court further notes that although Plaintiff's medical records containing physician statements regarding his treatment and diagnosis constitute hearsay, they would be admissible under the business records exception so long as the proper foundation was laid. See Federal Rule of Evidence 803(6); See also Petrocelli v. Gallison, 679 F.2d 286, 289-90 (1st Cir. 1982). The medical reports which contain Plaintiff's own statements regarding his injury were made for the purposes of treatment and/or diagnosis and as such are admissible under Federal Rule of Evidence 803(4). See id. at 289-90; see also Cook v. Hoppin,783 F.2d 684, 689-90 (7th Cir. 1986). The Court further notes that these statements are being considered only to determine the nature of the injury, and not the cause of the incident. As such, the Court finds that the record shows that Plaintiff sustained a bullet injury to his left hand.

might affect the outcome under the substantive law. See Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).

When deciding a motion for summary judgment, the Court must draw all inferences in a light most favorable to the non-moving party without weighing the evidence or questioning the witnesses' credibility. See id. The movant has the burden of demonstrating the absence of a genuine issue of material fact, while the non-movant must establish the existence of each element for which it bears the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant has pointed to sufficient evidence of record to demonstrate that no genuine issues of fact remain, the burden is on the non-movant to search the record and detail the material controverting the movant's position. See Schulz v. Celotex Corp., 942 F.2d 204, 210 (3d Cir. 1991). Rule 56 requires the non-moving party to go beyond the pleadings and show, through the evidence of record, that there is a genuine issue for trial. Celotex, 477 U.S. at 324.

Furthermore, "[a]t the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. 242, 249 (1986). However, *a court need not "turn a blind eye to the weight of the evidence."* Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) (emphasis added). In order for a dispute to be "genuine," the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts" but must instead "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (quotation marks omitted) (emphasis in original). "Where the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Id. at 587 (quotation marks omitted).

Defendants contend that they are entitled to summary judgment because Plaintiffs have failed to present sufficient evidence that the gun was defective. Defendants argue that Plaintiffs cannot proceed to trial without the use of an expert to explain how this incident could have occurred in the manner attested to by Plaintiff.[3] They assert that even if expert testimony is not required, the record is devoid of any evidence which would lead a rational fact-finder to conclude that the gun exploded without Plaintiff pulling the trigger and that the explosion caused the bullet to exit out of the left side of the gun. Finally, Defendants argue that Plaintiffs cannot rely on the product malfunction theory to advance their claims because (1) the actual product is available and has been subject to examination and testing and (2) Plaintiffs have identified a specific defect – an out of battery discharge ("OOBD") – which they claim caused the injuries in this case. Defendants state that even if the malfunction theory applied, Plaintiffs have failed to negate a reasonable secondary cause of the accident which Defendants have identified - that an outside force caused the damage to the gun.

---

[3] Plaintiffs originally disclosed two liability experts – Lester Roane and William Bruchey - in their Pretrial Statement on September 19, 2011. See (Doc. No. 39). Plaintiffs, however, subsequently withdrew their experts after the deposition of Mr. Roane which took place on October 17, 2011. See (Doc. No. 56-3). Plaintiffs submitted an Amended Pretrial Statement on November 17, 2011 (exactly one month after their proposed expert's deposition) and indicated that they no longer are utilizing the services of any liability experts. Plaintiffs state that the reason for the withdrawal was because their experts would not pass muster under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Specifically, Plaintiffs claim that "Mr. Roane's testimony does not meet the criteria of 'fit' set forth in [Daubert] as he based his opinions on assumptions rather than the facts of the case." Plaintiffs' Brief in Opposition (Doc. No. 61) at 15. The Court finds this statement to be disingenuous in light of Mr. Roane's testimony which indicates that Plaintiffs' counsel never told him about any of the facts of this case when he was asked to conduct his examination of the gun. (Doc. No. 51-14) at 5.

Plaintiffs contend they have set forth evidence sufficient to establish a prima facie case under the product malfunction theory and state that they have provided "competent" and "unrefuted" evidence that the gun malfunctioned in the manner described by Plaintiff and caused his injuries. They argue that expert testimony is not required to prove that the product was defective because lay testimony and observation of the gun suffice to establish that a malfunction occurred. Plaintiffs further assert that Defendants have failed to prove their theory that a reasonable secondary cause for the incident exists; as such, Plaintiffs argue that a genuine issue of material fact exists as to whether the product was defective under the product malfunction theory.

To recover under Pennsylvania law pursuant to a strict products liability theory, a plaintiff generally must prove that (1) the product was defective; (2) the defect was the proximate cause of the plaintiff's injuries; and (3) the defect existed at the time it left the manufacturer's control. See Barnish v. KWI Building Co., 980 A.2d 535, 541 (Pa. 2009). "In those cases where the *plaintiff is unable to produce direct evidence* of a product's defective condition and thus the precise nature of the product's defect, the plaintiff may, *in appropriate cases*, rely on the 'malfunction theory' of product liability." Walters v. General Motor Corp., 209 F.Supp.2d 481, 486 (W.D. Pa. 2002) (citing Woodin v. J.C. Penney Co., 629 A.2d 974, 975 (1993)) (emphasis added). Under this theory, a plaintiff may prove the existence of a defect through circumstantial evidence. See Walters, 209 F.Supp.2d at 486.

To establish a claim under the product malfunction theory a plaintiff must present "(1) evidence of the occurrence of a malfunction and (2) evidence eliminating abnormal use and (3) evidence eliminating reasonable secondary causes for the accident." Walters, 209 F.Supp.2d at 486-87 (citing Altronics of Bethlehem, Inc. v. Repco, Inc., 957 F.2d 1102, 1105 (3d Cir. 1992));

7

see also Barnish, 980 A.2d at 541. Although the malfunction theory "does not relieve the plaintiff of the burden of establishing a defect," it *permits the malfunction itself* to serve as circumstantial evidence of a defective condition provided the remaining evidence is sufficient to support the other elements." Walters, 209 F.Supp.2d at 487 (emphasis added). In general, establishing a prima facie case under the product malfunction theory "does not require a plaintiff to proffer expert testimony to prove how the product was defective or how the defect arose as a result of actions taken by the manufacturer or seller." Id. at 487 (citing Dansak v. Cameron Coca-Cola Bottling Co., Inc., 703 A.2d 489, 496 (Pa. Super. 1997)). Expert testimony is required, however, if the subject matter is beyond the comprehension of the average juror. See Chubb v. On-Time Wildlife Feeders, 578 F.Supp.2d 737, 739 (M.D. Pa. 2008).

For the reasons set forth below, the Court finds that Plaintiffs cannot satisfy the first element of their prima facie case because they have failed to present sufficient evidence that the gun was defective. The Court first notes that Defendants' contention regarding the applicability of the product malfunction theory is well-taken. The Court fails to see how or why the malfunction theory would apply in a case like this where (1) the actual product (gun) is available and has been subjected to testing and examination and (2) a specific defect (an out of battery discharge) has been identified by Plaintiffs. Indeed, the underlying purpose of the malfunction theory is to afford plaintiffs the opportunity to submit their case to a jury in cases where they lack direct evidence of the defect because the product is unavailable through no fault of their own.[4] It was designed to prevent the automatic grant of summary judgment every time the actual

---

[4] See e.g., Barnish, 980 A.2d at 535 ( "[A] plaintiff pursuing a case under the malfunction theory can assert a successful strict product liability claim based purely on circumstantial evidence in cases *where the allegedly defective product has been destroyed or is otherwise unavailable.")* (emphasis added); Dansak, 703 A.2d at 495 ("We agree with the sound reasoning of Gordner: failure to produce the product is not fatal to [plaintiff]'s claim if she can proceed with

product is destroyed, lost or otherwise unavailable through no wrongdoing on the part of a plaintiff. See Dansak, 703 A.2d at 493-96. In essence, the malfunction theory is intended to benefit those plaintiffs who did not have the benefit of examining the allegedly defective product. See id. Here, Plaintiffs are in possession of the actual gun and have subjected it to testing and examination by two experts, who they do not intend to call at trial. Thus, there is no need to "level the playing field" because Plaintiffs are *theoretically* capable of proving the alleged defect through direct evidence (the actual gun).

Furthermore, Plaintiffs consistently have maintained that a specific defect - an out of battery discharge - caused the gun to explode.[5] See e.g., Plaintiff's Pre-Trial Statement (Doc No. 39) (filed 9/19/11 – "Plaintiff Regis Ellis experienced an "out of battery" firing which caused the subject handgun to catastrophically fail"); Plaintiff's Amended Pre-Trial Statement (Doc. No. 47) (filed 11/17/11-same); August 5, 2010 Letter to Defense Counsel (Doc. No. 56-14)

---

circumstantial evidence under a malfunction theory, and [plaintiff] was in no way at fault for disposing or failing to preserve the product."); Nowak By and Through Nowak v. Faberge, U.S.A., Inc., 812 F.Supp. 492, 496 (M.D. Pa. 1992) ("The valve assembly was destroyed and/or lost, and was unavailable for inspection and analysis. Consequently, plaintiff proceeded on the malfunction theory to establish the defect."); Mracek v. Bryn Mawr Hosp., 363 Fed. Appx. 925 (3d Cir. 2010) ("When a plaintiff is *unable to adduce direct proof of a defect*, the malfunction theory of liability permits him or her to prove defect with circumstantial evidence."); Wiggins v. Synthes, 29 A.3d 9, 14 (Pa. Super. 2011) (plaintiff pursuing malfunction theory may base case purely on circumstantial evidence "in cases where the allegedly defective product has been destroyed or is otherwise unavailable"); Blumer v. Ford Motor Co., 20 A.3d 1222, 1229 (Pa. Super. 2011) (same); Rogers, 565 A.2d 751, 754 (Pa. 1989) ("*In some instances*, however, the plaintiff may not be able to prove the precise nature of the defect *in which case reliance may be had on the "malfunction" theory* of product liability.).

[5] Although Plaintiffs seek to argue that an out of battery firing is the specific defect which caused the gun to explode in Plaintiff's hand, the Court fails to see how the out of battery discharge can in and of itself serve as the specific defect in the gun. An out of battery firing is what occurs as a result of the gun being defective in some other aspect and Plaintiffs have failed to set forth any evidence whatsoever to establish what the specific defect was that caused the gun to allegedly fire out of battery in the first place. Lay testimony certainly would not suffice in allowing a jury to competently make this determination.

("forensic evidence of the subject firearm makes it clear that it fired out-of-battery during the incident in question and caused the failure of the firearm"). Notably, Plaintiffs retained the theory of an out of battery firing in their Amended Pre-Trial Statement despite their simultaneous withdrawal of Lester Roane, the proposed expert who posited the theory originally. Regardless of whether the malfunction theory applies in this case, "the goal is the same: to prove that the product was not only defective, but that such a defect existed when it left the hands of the seller." Dansak, 703 A.2d at 496. The Court finds that Plaintiffs have failed to prove that the gun was defective under any theory of liability; specifically, Plaintiffs have not produced competent and sufficient evidence that the gun contained a specific defect or that it malfunctioned as a result of some unspecified defect.

### *The Evidence is Insufficient to Prove the Existence of a Specific Defect*

In arguing that an out of battery discharge was the cause of the explosion, Plaintiffs have failed to offer any evidence which proves that the gun was able to fire out of battery without the trigger being pulled and with the slide being 0.5 to 0.75 inches open. Plaintiffs also have failed to establish that an out of battery firing could cause a bullet to exit the gun from anywhere other than the muzzle. The only evidence Plaintiffs cited to in support of their theory is Plaintiff's own testimony and the testimony of Williams - Plaintiff's friend, eyewitness and the owner of the gun. Read in the light most favorable to Plaintiffs, these two pieces of lay testimony establish the following:

(1) the gun spontaneously exploded after Plaintiff shot seven rounds of ammunition,
(2) prior to shooting his eighth and final round, Plaintiff noticed that the slide was approximately 0.50 to 0.75 inches open,
(3) as Plaintiff was reaching towards the slide with his left hand to "clear the jam" the gun spontaneously exploded in his hand,
(4) Plaintiff did not pull or touch the trigger when the gun exploded,

(5) the damage to the gun was such that it looked like the bullet came out of the trigger housing/left side of the gun,

(6) the bullet did not exit out of the muzzle,

(7) Plaintiff's hand was not in front of the muzzle at the time the gun exploded,

(8) Plaintiff was not handing the gun to Williams at the time the gun exploded,

(9) Williams did not see the actual explosion but turned around after he heard it and saw the gun flying out of Plaintiff's hand, and

(10)     The eighth round of ammunition was not in the gun after the incident occurred.

See Plaintiff's Deposition (Doc. No. 56-2); Williams Deposition (Doc. No. 61-1). All this testimony serves to establish is that the gun exploded in Plaintiff's hand without him ever touching the trigger and that the explosion caused the eighth and final round of ammunition to exit - not from the muzzle - but from the left side of the gun. This testimony offers absolutely no insight as to what an out of battery firing is, how it could occur in the manner attested to by Plaintiff, what the defect even was that caused the gun to fire out of battery and how an out of battery firing could cause the type of damage that was caused to the gun.[6]  Williams' testimony cannot even corroborate Plaintiff's claim that he did not have his finger on the trigger at the time of the incident because Williams did not see the incident actually happen - he just "turned around" and "seen the gun flying out of his hand." (Doc. No. 61-1) at 79.

Moreover, Plaintiff's account of the incident necessarily will require a jury to make a series of speculative inferences in order to find in Plaintiffs' favor.  Specifically, in order for a reasonable juror to conclude that an out of battery firing occurred, he or she must first find that: 1) the gun was able to fire out of battery without the trigger being pulled, 2) the gun was capable of firing out of battery while the slide was 0.5 to 0.75 inches open, and 3) the out of battery firing

---

[6] The physical evidence indicates that there was damage to the pistol's frame and slide and that the recoil spring was bent; there was no damage to the trigger, the trigger bar or to any of the gun's internal components.  See Expert Report of Robert T. Levine, Ph.D. (Doc. No. 45-2) at 11.

was capable of causing the bullet to exit out of the left side of the gun – and not the muzzle. The problem for Plaintiffs is that (1) all of these conclusions are completely unsupported by the record evidence and (2) non-expert evidence will not suffice to provide the jury with a competent and adequate basis to make these findings.

According to Defendant's expert, Dr. Robert Levine, an out-of-battery discharge "may occur when the firing pin is released from a cocked position before the slide is fully forward (in battery position)." Expert Report of Robert T. Levine, Ph.D. (Doc. No. 45-2) at 11. Upon testing and examination, Dr. Levine concluded that an out of battery discharge: (1) cannot occur in a Hi-Point C9 9mm handgun unless the trigger is pulled; (2) cannot occur if the slide is open 0.10 inches or more;[7] (3) cannot cause the bullet to exit from anywhere other than the muzzle; and (4) does not cause the particular kind of damage that was caused to the subject gun. See (id.) at 9-13. He further explained that "the physical evidence not only does not support, it definitely refutes [Plaintiff]'s claim that a round of ammunition discharged by the pistol traveled downward and sideways before exiting the pistol 'out of the trigger housing' and producing the damage [Plaintiff] circled on the photograph attached as . . . Exhibit 4 to this report." (Doc. No. 45-2) at 11. This conclusion was based on the fact that his inspection revealed "absolutely no damage to the magazine the walls of the magazine well, the trigger bar, the chamber, the barrel, the feed ramp to the barrel's chamber, the grips or any other internal areas of the pistol." (Id.)

Plaintiff's (now withdrawn) expert, Lester Roane, testified that he could not get the gun to fire when it was more than .070 inches open and that he "would not expect it to fire when it

----

[7] Dr. Levine found that "Hi-Point pistols cannot discharge a round of ammunition when the slide is approximately 0.10 inches or more rearward because at this point the engagement between the trigger bar and the sear cam is broken." (Doc. No. 45-2) at 11.

12

was half an inch open."[8] Roane Deposition (Doc. No. 51-14) at 10. He also testified that he had

to pull the trigger in order to achieve an out of battery firing and that an out of battery firing

would not cause a bullet to come out the side of the gun. Roane Deposition (Doc. No. 50-14) at

8, 20. Significantly, Mr. Roane testified that he would be speculating if he were to say that the

damage to the pistol was caused by an out of battery discharge. (Doc. No. 51-14) at 15.

Against this backdrop, the record evidence overwhelmingly demonstrates that the gun

was incapable of operating in the manner alleged by Plaintiffs. Specifically, the gun could not

have experienced an out of battery discharge without the trigger being pulled and with the slide

being more than 0.10 inches open. Even if the gun did fire out of battery, it would not have

caused the particular kind of damage to the gun and it would not have caused a bullet to exit

from anywhere other than the muzzle. Indeed, Plaintiffs' account of the incident is rendered

physically impossible by the evidence and the onus was on Plaintiffs to come forward with more

than just lay testimony and pictures of the gun to show that such a scenario was plausible.

Plaintiffs, however, have not pointed to any specific facts which show that genuine issues of

material fact exist as to whether Plaintiff's account of the incident was, at the very least, within

the realm of possibility. Given the fact that Plaintiff's version of the story is completely refuted

by the expert and physical evidence, expert testimony was required to prove that an out of

battery discharge was the specific defect which caused the injuries in this case.[9]

---

[8] The Court notes that the evidence offered by Plaintiff's proposed but now withdrawn expert still constitutes relevant evidence of record which the court must consider in determining whether any genuine issues of material fact exist.

[9] In finding Plaintiff's account of the incident implausible, the Court notes that it is not engaging in any credibility determinations; to the contrary, the Court is accepting as true all of Plaintiffs' allegations and concluding that the non-expert evidence, even taken in the light most favorable to them, is woefully insufficient to establish that the gun physically was capable of operating in the manner described by Plaintiff. The Court also notes that it is not required to "turn a blind eye to

The Court acknowledges that expert testimony is not required as a matter of course in all products liability cases to establish a defect. See Walters v. General Motor Corp., 209 F.Supp.2d 481, 487 (W.D. Pa. 2002) (citing Dansak v. Cameron Coca-Cola Bottling Co., Inc., 703 A.2d 489, 496 (Pa. Super. 1997). Whether expert evidence will be required depends on whether "all the primary facts can be accurately and intelligibly described to the jury, and if they, as [persons] of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training of the subject under investigation." Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 415-16 (3d Cir. 1999) (citation omitted); see also Cipriani v. Sun Pipe Line Co., 574 A.2d 706, 710 (Pa. Super. 1990) ("However, expert testimony is not required when the matter under consideration is simple and lack of ordinary care is obvious and within the range of comprehension of the average juror.") (citations omitted).

The Court finds that expert testimony was required in this case because lay testimony and pictures of the gun will not suffice to accurately and intelligibly describe to the jury all of the primary facts in order for them to correctly conclude that the firearm was capable of discharging in the manner alleged. The question of whether a gun is able to fire out of battery without pulling the trigger and with the slide being 0.5 to 0.75 inches open is a technical and scientific issue requiring specialized knowledge of the internal operations of firearms. It is not a question that reasonably is capable of being answered by merely observing the gun and listening to the allegations. Given the fact that Plaintiff is claiming that a gun exploded in his hand without him ever touching the trigger, the alleged defect which caused the explosion is not obvious enough to

the weight of the evidence." BMW., 974 F.2d 1358, 1363 (3d Cir. 1992) (internal quotations and citations omitted).

be ascertained by the average juror without speculation.  Compare Padillas, 186 F.3d at 415-16

(denying summary judgment because non-expert testimony and picture evidence were sufficient

to prove defect; juror could look at a chicken cutter with exposed blades and determine whether

it was defective for not having a guard to cover the blades) with Oddi v. Ford Motor Co., 234

F.3d 136, 159-60 (3d Cir. 2000) (granting summary judgment to defendants because the Court

found that a juror could not look at a bread truck and reasonably conclude whether a bumper was

defective without expert testimony).  The Court finds that this case is more akin to Oddi, because

the lay testimony and picture evidence will not suffice to provide the jury with a reasonable basis

to conclude that the gun fired out of battery without Plaintiff pulling the trigger.  Thus,

Plaintiffs' failure to present expert testimony on this matter prevents them from establishing that

the gun contained a specific defect.  The only question which remains is whether Plaintiffs would

be successful in arguing that an unspecified defect caused the gun to spontaneously explode

under the product malfunction theory.

### *Plaintiffs Cannot Meet Burden under Product Malfunction Theory*

Assuming for the sake of argument that Plaintiffs are able to rely on this theory despite

the fact that the actual gun is not destroyed, lost, or otherwise unavailable, Plaintiffs still cannot

make out a prima facie case under the malfunction theory because they have failed to (1)

establish that a malfunction occurred and (2) negate the possibility of a reasonable, secondary

cause for the accident.[10]  As discussed earlier, a plaintiff establishes a prima facie case under the

malfunction theory if he comes forward with 1) evidence demonstrating that a malfunction

occurred, 2) evidence eliminating abnormal use, and 3) evidence eliminating reasonable,

---

[10] The Court was unable to find case law which would support a finding that Plaintiffs are
precluded from relying on the malfunction theory as a matter of law in light of their actual
possession of the allegedly defective product.

secondary causes for the incident. See Barnish, 980 A.2d at 541-43. The plaintiff bears the

burden of "eliminating abnormal use or reasonable secondary causes." Roselli v. General

Electric Co., 599 A.2d 685, 688 (Pa. Super. 1991). The defendant's "burden is only to identify

other possible non-defect oriented explanations." Id. (emphasis added). If "an explanation

consistent with the existence of a defect is as probable as an explanation inconsistent with the

existence of a defect, the plaintiff cannot be held to have met his burden [and] [a] jury may not

be permitted to speculate." Lonon v. The Pep Boys, Manny, Moe & Jack, 538 A.2d 22, 26 (Pa.

Super. 1988) (citations omitted).

Although Plaintiffs are not required to prove a specific defect under the malfunction

theory, they must still establish that the product was defective and cannot rely on speculation,

conjecture, or guesswork to meet this burden. See Dansak, 703 A.2d at 496. Under the

malfunction theory, evidence of the occurrence of a malfunction itself "is circumstantial

evidence of a defective condition." Dansak, 703 A.2d at 496. However, "[t]he mere fact that an

accident happens, even in this enlightened age, does not take the injured plaintiff to the jury." Id.

Furthermore, even though expert testimony is "desirable from the Plaintiff's perspective [in a

manufacturing defect case], [] it is not essential" under the malfunction theory.[11] Id. As the

court in Dansak explained:

> The plaintiff, even without expert testimony articulating the specific
> defect, may be able to convince a jury that the product was defective when it left

---

[11] The Court notes that in design defect cases, "the plaintiff need not resort to the malfunction
theory. Rather, he or she may prove the defect by presenting expert testimony based on an
examination of similar articles to the one that injured the plaintiff." Dansak, 703 A.2d at 496
fn.8 (citing O'Donnell v. Big Yank, Inc., 696 A.2d 846, 849 (Pa. Super. 1997). The rationale
underlying why the use of the malfunction theory is discouraged in design defect cases is
because plaintiffs have access to the entire line of the product and are not disadvantaged by an
inability to examine and test the actual product. In this Court's estimation, the same logic would
apply to plaintiffs who are in possession of the actual product in manufacturing defect cases.

the seller's hands by producing circumstantial evidence. Such circumstantial evidence includes (1) the malfunction of the product; (2) expert testimony as to a variety of possible causes; (3) the timing of the malfunction in relation to when the plaintiff first obtained the product; (4) similar accidents involving the same product; (5) elimination of other possible causes of the accident; and (6) proof tending to establish that the accident does not occur absent a manufacturing defect.

Dansak, 703 A.2d at 496.  However, this is not to say that expert testimony will never be required in a malfunction case.  Indeed, if the subject matter is beyond the comprehension of the average juror, expert testimony will be required to prove that the product malfunctioned in the manner alleged.  See Chubb, 578 F.Supp.2d at 739.

The Court finds that the record evidence does not suffice to support the claim that the gun contained an unspecified defect which caused it to malfunction and explode in Plaintiff's hand without him pulling the trigger.  The Court further finds that Plaintiffs were required to produce expert testimony to prove their claim under the malfunction theory for the same reasons why they required expert evidence to support their specific defect claim – Plaintiff's account of the incident is by all indications physically impossible and expert testimony was required to prove that a gun could explode without pulling the trigger.  While Plaintiffs were not required to identify a specific defect under the malfunction theory, they still were required to come forward with sufficient evidence demonstrating that a defect existed.  Such a showing necessitated the use of expert evidence in this case because in order for the jury to find that a malfunction occurred, they necessarily would have to find that the gun was capable of exploding without someone pulling the trigger.  Plaintiffs have offered absolutely no evidence in support of this proposition aside from Plaintiff's own account of the incident, which does nothing more than establish that an accident occurred on April 13, 2007.  Proof of an accident will not take Plaintiffs to the jury.  See Dansak, 703 A.2d at 496.

Additionally, the physical evidence establishes that the eighth round of ammunition necessarily would have had to exit out of the muzzle because the internal components of the gun were still intact and the physical evidence does not support any finding that a bullet exited out of the left side of the gun. The lay testimony and picture evidence offer no insight as to whether a gun can spontaneously explode in one's hand without activating the trigger mechanism and discharge a bullet out of its side as a result. Indeed, it is precisely the implausible manner in which the incident is alleged to have occurred which distinguishes this case from others that have not required the presentation of expert testimony in malfunction theory cases.[12] This is not a case where Plaintiff alleges that he pulled the trigger which <u>then</u> caused the gun to explode. Instead, he vehemently denies pulling the trigger after he fired the seventh round of ammunition. <u>See</u> Plaintiff's Deposition (Doc. No.51-3) at 3, 8. At least if he had pulled the trigger he would have activated the mechanism required for any function or malfunction to take place. Plaintiff's allegation is akin to arguing that a car suddenly accelerated despite the key not being in the ignition or a toaster catching fire despite it not being plugged in.

Importantly, Plaintiffs do not cite to or rely on any other types of circumstantial evidence to help strengthen the inference that the gun malfunctioned. <u>See</u> <u>Dansak</u>, 703 A.2d at 496. They have no evidence of prior similar accidents, no expert testimony as to the possible causes for the spontaneous explosion, or any proof tending to establish that a gun can explode without pulling the trigger. Indeed, all they appear to rely on is lay testimony and the observation of the actual gun to support their claim that the gun exploded in the manner attested to by Plaintiff. These

---

[12] See <u>e.g.</u>, <u>Dansak</u>, 703 A.2d at 496-97 (expert not required to explain that bottle malfunctioned by breaking in six-pack); <u>Padillas</u>, 186 F.3d at 415–16 (expert not required to explain why unguarded blades on chicken cutter were defective).

pieces of evidence cannot and will not be able to assist a jury in determining whether it was possible for the gun to discharge a bullet out of its side without Plaintiff pulling the trigger.

In light of the above, the Court finds that expert testimony was required for Plaintiffs to prove their claim under the product malfunction theory. The alleged malfunction in this case is not obvious enough to be ascertainable by mere observation. See Oddi, 234 F.3d at 159-60. The Court further finds that the primary facts of this case are beyond the comprehension of the average juror in that the average juror will be unable to correctly draw the conclusion that a gun is capable of exploding without anyone pulling the trigger without sufficient evidence demonstrating that such a happening is technically possible. Consequently, Plaintiffs' failure to present expert testimony in support of their claim precludes them from establishing by a preponderance of evidence that a malfunction occurred in this case.

Assuming, however, that the record evidence somehow is sufficient to establish that a malfunction occurred, Plaintiffs still cannot meet their burden under the malfunction theory because they cannot negate the reasonable secondary cause for the accident which was identified by the Defendants – that the damage to the pistol was caused by a force from outside the pistol.

In order to survive summary judgment, a plaintiff relying on the malfunction theory must demonstrate normal use and present "a case-in-chief free of secondary causes." Rogers v. Johnson & Johnson Prods., Inc., 565 A.2d 751, 755 (1989). This principle was further discussed in Dansak, where the court offered this summary:

> In plaintiff's case-in-chief, plaintiff [need not] negate every theoretically conceivable secondary cause for the malfunction. Rather ... the plaintiff fails to establish a prima facie case only if the plaintiff does not negate evidence of other reasonable, secondary causes or abnormal use that is actually introduced during the plaintiff's case-in-chief. In other words, the plaintiff fails to establish a prima facie case if, *based upon his own proof,* more than one cause could account for the accident.

Dansak, 703 A.2d at 497 (emphasis added) (internal citations and quotations omitted). The Court finds that Plaintiffs have failed to eliminate the reasonable, secondary cause for the incident identified by Defendants in this case – that the damage to the gun was caused by an outside force.  Defendants argue that the gun was shot by another firearm and their expert concluded that after "[c]onsidering the areas of damage" the "damage to the pistol was caused by a force from outside the pistol and not from a cartridge discharged within the pistol." (Doc. No. 45-2) at 11, 12.  While their expert did not actually conduct any testing in order to conclusively determine whether the subject gun was shot at by another firearm, he physically examined the subject firearm and concluded that "the bend on the recoil spring" was "more likely than not due to being struck by an object that came from outside the pistol." Id. at 11.

Defendants also supplied Dr. Levine with photographs that reflect images of what it looks like when this kind of pistol is shot by another gun. See Doc No. 56-16.  Dr. Levine compared the gun to those pictures and found that the "similarity in the type of damage to those pistols to the pistol in question is remarkable." (Doc. No. 45-2) at 11. He also qualified his opinion and emphasized that they "were made independent of the photographs supplied" and that "the opinions expressed in this report are based on the observations made during the inspection of the pistol." ( Id.)  Contrary to Plaintiffs' assertions, Defendants were required to do no more. See Roselli, 599 A.2d at 688.

Defendants identified this secondary cause based on their inspection of the actual handgun and a comparison of photographs containing images of what a gun looks like after it had been shot with another gun.  Defendants identified this alternative theory based on Plaintiff's own proof – the gun in question – and were not required to actually prove it.  It was Plaintiffs

who bore the burden of eliminating this theory as a reasonable secondary cause and they failed to do so despite having sufficient time.[13] Defendants relayed this theory to Plaintiffs on October 21, 2010, (See Doc. No. 56-16), however Plaintiffs did not even tell their expert about Defendants' theory that the gun was shot by another gun until August 16, 2011, and never asked him at any point to conduct any testing to refute their theory.[14] See Roane Deposition (Doc. No. 50-14) at 11; see also Plaintiffs' Letter to Roane (Doc. No. 62-5 at 3). The Court finds that merely asking Mr. Roane to look at the pictures and determine whether they changed any opinions in his report is insufficient to eliminate this identified cause as a possibility. See (Doc. No. 62-5 at 3) ("I kindly request that you review the attached documents to the extent you deem necessary and supplement your original opinion in this case by stating that you have reviewed these documents and then rendering an opinion regarding the above detailed defenses.").[15]

In light of Plaintiffs' implausible account of how the incident occurred, the Court finds that Defendants' explanation is consistent with the existence of a non-defect and is just as probable as Plaintiffs' explanation for the incident. See Lonon, 538 A.2d at 26. This conclusion is buttressed by the fact that Mr. Roane, at his deposition, could not distinguish between the

---

[13] Although Plaintiff forwarded Defendants' pictures to Mr. Roane on October 26, 2010, the correspondence failed to identify the pictures and explain what they purported to be. See (Doc. No. 62-4). The letter only identifies the pictures as "Photographs of Testing conducted by Beemiller, Inc.," and states: "Enclosed please find photographs I received from Mr. Renzulli. Should you have any questions or concerns, please do not hesitate to contact my office." (Id.).

[14] Mr. Roane testified that he was never asked to conduct any testing to determine whether the gun had been shot by another firearm. See Roane Deposition (Doc. No. 56-3 at 7).

[15] This request was contained in a letter which also identified 20 different categories of documents that were being forwarded to Roane. The Court notes that Roane never provided a specific response with respect to the viability of Defendants' theory. His "supplemental opinion" consisted of the following: "I have just speed-read through the material you sent me a couple of weeks ago. There is nothing in there that would cause me to change my opinion about the cause of the incident. My only concern is that all of the non-deposition filings include Federal as a defendant. There is nothing in my findings to indicate that the ammunition was in any way defective." Roane's Email to Plaintiffs' Counsel (Doc. No. 62-6).

photographs of the incident firearm and Defendants' photographs of what Hi-Point C9 pistols look like after they had been shot by another firearm.[16]  See Roane Deposition (Doc. No. 56-3 at 8) ("It certainly looks like [the same gun]" because "I didn't see anything in [those photographs] that was new or exciting to me").  Roane repeatedly testified that he believed the eight photographs represented the incident firearm that he had examined and called them "old news" because they did not "convey any new information." (Id.).  The reasonableness of the Defendants' alternative theory is thus reinforced by the fact that a firearms expert who inspected the gun in question could not tell the difference between the subject firearm and the Hi-Point C9 pistol in the eight photographs.  Plaintiffs, therefore, have failed to make out a prima facie case under the malfunction theory because they have failed to present a case-in-chief free of secondary causes.[17]  See Rogers, 565 A.2d at 755.

Accordingly, the Court finds that Plaintiffs have failed to present competent, sufficient evidence in support of their claims and have not met their burden of proving a defect under any theory of liability.[18]  Even taking everything in the light most favorable to Plaintiffs, and

---

[16] The eight photographs of what a Hi-Point C9 pistol looks like after being shot with another firearm can be found at (Doc. No. 56-16).

[17] This is not a case where Plaintiffs set forth one plausible theory, Defendants set forth another, and either version fairly could be credited by the jury. See Dansak, 703 A.2d at 498. The issue in this case is that Plaintiffs have failed to offer sufficient evidence in support of their version of the story such that the jury would be speculating if it adopted their account of the events and rendered a verdict in their favor.

[18] The Court notes that it would have applied the Restatement (Third) of Torts if this case had proceeded to trial. The product malfunction theory under the Third Restatement is found in Section 3 and states:

It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:

(a) was of a kind that ordinarily occurs as a result of product defect; and

granting them the benefit of all reasonable inferences, the evidence in this case is woefully

insufficient for a reasonable jury to conclude that the gun either was capable of firing out of

battery without the trigger being pulled or that it malfunctioned without the trigger being pulled

as a result of some unspecified defect.  Plaintiffs cannot build their case by attempting to bridge

one speculative inference with another.  The Court is not concluding that the incident could not

have happened in the manner that Plaintiffs alleged. It merely finds that the Plaintiffs have not

offered evidence sufficient for a reasonable jury to so conclude.  On this record, a jury cannot

correctly determine whether Plaintiff's account of the incident is possible and they must not be

permitted to speculate as to whether the gun could discharge and explode without pulling the

trigger based simply on lay testimony and picture evidence. This evidence is not competent to

support a finding by the preponderance of the evidence that the gun was defective. Therefore, the

Court finds that no genuine issues of material fact exist as to any of Plaintiffs' claims and that

Defendants are entitled to the grant of summary judgment.[19]

---

       (b) was not, in the particular case, solely the result of causes other than product
       defect existing at the time of sale or distribution.

Restatement (Third) of Torts, § 3 (2012). Although the elements are stated a bit differently, the
end result is the same - regardless of which Restatement applies, Plaintiffs have failed to offer
circumstantial evidence sufficient to create a reasonable inference that a defect even existed. See
Restatement (Third) of Torts, § 3 (2012).

[19] Plaintiffs' failure to prove that the gun was defective also precludes them from establishing
their breach of warranty claims and Plaintiff-Wife's loss of consortium claim. See Hoffman v.
Paper Converting Machine Co., 694 F.Supp.2d 359, 373 (E.D. Pa. 2010) ("When a plaintiff
relies upon circumstantial evidence that the product is defective for the purposes of the implied
warranty of merchantability, he must do more than merely prove a defect. Plaintiff must further
negate abnormal use and reasonable secondary causes") (citing Altronics of Bethlehem, Inc. v.
Repco, Inc., 957 F.2d 1102, 1105 (3d Cir. 1992); see also Scattaregia v. Shin Shen Wu, 495 A.2d
552, 554 (Pa. Super. 1985) (loss of consortium action is a derivative claim and its success is
dependent upon injured spouse's right to recover).

An appropriate Order will be issued.


Date: <u>November 19, 2012</u>                    <u>s/Alan N. Bloch</u>
                                               United States District Judge

ecf:    Counsel of record