IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REGIS ELLIS and BONNIE ELLIS, his wife, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | Civil Action No. 09-1414 |
| BEEMILLER, INC. and MKS SUPPLY, INC., t/d/b/a HI-POINT FIREARMS, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

BLOCH, District J.

Presently before the Court is Defendant Beemiller, Inc.'s and Defendant MKS Supply, Inc.'s Motion for Sanctions (Doc. No. 54). For the reasons set forth below, Defendants' motion will be granted.

## I.    **Standard for Sanctions**

Rule 11 of the Federal Rules of Civil Procedure provides, in relevant part:

> Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name.... By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney . . . certifies that, *to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.*...If, after notice and a reasonable opportunity to respond, the court determines that Rule 11[] has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation....Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

Fed.R.Civ.P. 11 (2012) (emphasis added). Rule 11 imposes upon attorneys an affirmative duty to conduct a reasonable investigation into the facts of a claim both prior to filing suit and thereafter in order to ensure that the assertions contained in each paper submission are made with reasonable belief that they are well-grounded in fact. See Bradgate Associates, Inc. v. Fellows, Read & Associates, Inc., 999 F.2d 745, 751 (3d Cir. 1993) ("Rule 11 imposes on any party who signs a document submitted to the court an affirmative duty to conduct a reasonable inquiry into the facts and law before filing."); see also Fed.R.Civ.P. 11, Advisory Committee Notes to 1993 Amendment (Rule 11 "applies only to assertions contained in papers filed with or submitted to the court"). Indeed, an attorney's signature on a document serves as certification that he "has conducted a reasonable inquiry and has determined that any papers filed with the court are factually well-grounded." Bradgate, 999 F.2d at 751 (citing Lony v. E.I. Du Pont De Nemours & Co., 935 F.2d 604, 616 (3d Cir. 1991)).

The importance of an attorney's duty to conduct a reasonable investigation into the facts prior to filing suit was highlighted by the United States Court of Appeals for the Seventh Circuit, who noted that "[t]he principal function of the 1983 amendment to Rule 11 was to add the requirement of adequate investigation before filing a complaint." Szabo Food Service, Inc. v. Canteen Corp., 823 F.2d 1073, 1083 (7th Cir. 1987). The Court explained that:

> [i]t is not permissible to file suit and use discovery as the sole means of finding out whether you have a case. *Discovery fills in the details, but you must have the outline of a claim at the beginning.* Rule 11 requires *independent* inquiry.... The amount of investigation required by Rule 11 *depends on both the time available to investigate* and on the *probability that more investigation will turn up important evidence.*

Id. at 1083 (emphasis added). Even if an attorney conducts an adequate factual investigation prior to filing suit, he may still violate Rule 11 by way of his later filings if he (i) submits documents to the court that contain assertions that are not well-grounded in fact, and/or (ii)

maintains a position advocated in an earlier submission after learning that it ceases to have any merit. See Fed.R.Civ.P. 11, Advisory Committee Notes to 1993 Amendment (discussing how a "litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those [documents] after learning that they cease to have any merit.").

A district court charged with the duty of assessing whether a document was submitted in violation of Rule 11 "is expected to avoid the wisdom of hindsight and should test the signer's conduct by [asking] *what was reasonable to believe at the time the pleading, motion, or other paper was submitted.*" CTC Imports & Exports v. Nigerian Petroleum Corp., 951 F.2d 573, 578 (3d Cir. 1991) (citing Notes of Advisory Committee on Rules, 1983 Amendment, Fed.R.Civ.P. 11) (emphasis added). In making this determination, the court does not concern itself with the question of whether an attorney filed the document in good-faith; instead, the court must apply an objective standard and consider all of the material circumstances surrounding the submission. See Bradgate, 999 F.2d at 752 (Rule 11 now "seeks to discourage pleadings without factual foundation, even though the paper was not filed in subjective bad faith"); see also Fed.R.Civ.P. 11, Advisory Committee Notes to 1993 Amendment ("This [objective] standard is more stringent than the original good-faith formula and thus it is expected that a greater range of circumstances will trigger its violation.").

Relevant factors a court should consider in evaluating the sufficiency of an investigation into the facts of a claim include: (1) the *amount of time* the signing attorney had to conduct an independent investigation, (2) the *need to rely on the client for information* as to the facts, and (3) whether the signer had to rely on prior counsel or another member of the bar (if the case was

3

transferred). See Bradgate, 999 F.2d at 752 (citing Advisory Committee Note, 97 F.R.D. 165,

199). As the United States Court of Appeals for the Third Circuit ("Third Circuit") explained:

> [I]f a client comes into an attorney's office for an initial consultation concerning a possible case one day before the statute of limitations will run, the attorney might be justified in filing a complaint predicated on an inquiry which would be inadequate if the attorney had more time for investigation. On the other hand, *an attorney with a great deal of time to file a document might be expected to make a more comprehensive inquiry than an attorney working under severe time constraints.*

Garr v. U.S. Healthcare, Inc., 22 F.3d 1274, 1279 (3d Cir. 1994) (emphasis added).

Although Rule 11 does not preclude an attorney from relying on information provided by

others, the reasonableness of this reliance depends on the nature of the claim, the time to

investigate, and whether the circumstances are such that he cannot reasonably be expected to

attain the salient information independently through other means. See e.g., Garr, 22 F.3d at

1278-79 ("[N]o one could argue fairly that it would be unreasonable for an attorney to rely on

witnesses to an accident before bringing a personal injury action. After all, the accident hardly

can be reconstructed for the benefit of a plaintiff's attorney."). Indeed, the question of *"whether*

*[the attorney] is in a position to know or acquire the relevant factual details"* is significant to the

Rule 11 inquiry. Colburn v. Upper Darby Township, 838 F.2d 663, 667 (3d Cir.), cert. denied

489 U.S. 1065 (1988) (emphasis added). Thus, while an attorney is not required to disbelieve his

own client, the reasonableness of his reliance on his client's story is dependent upon the

circumstances. See CTC Imports, 951 F.2d at 579; see also Southern Leasing Partners, Ltd. v.

McMullan, 801 F.2d 783, 788 (5th Cir.1986) ("Blind reliance on the client is seldom a sufficient

inquiry ....").

Thus, while Rule 11 certainly does not mandate "that an investigation into the facts be

carried to the point of absolute certainty," it does require that the investigation be objectively

reasonable in light of all the circumstances.  Forbes v. Eagleson, 228 F.3d 471, 488 (3d Cir.

2000) (quoting Kraemer v. Grant County, 892 F.2d 686, 689 (7th Cir.1990)).  As the Third

Circuit instructed:

> [I]f under an objective standard, the signer made a reasonable inquiry both
> as to the fact and the law at the time a document was submitted, subsequent
> developments showing that the signer's position was incorrect will not subject the
> signer to Rule 11 sanctions for having submitted the document. On the other
> hand, a signer making an inadequate inquiry into the sufficiency of the facts and
> law underlying a document will not be saved from a Rule 11 sanction by the
> stroke of luck that the document happened to be justified.

Garr, 22 F.3d at 1279.  Indeed, "[a] *shot in the dark is a sanctionable event, even if it somehow*

*hits the mark"* because "if a lucky shot could save the signer from sanctions, the purpose of Rule

11 'to deter baseless filings' would be frustrated."  Id. at 1279 (citing Vista Mfg., Inc. v. Trac-4

Inc., 131 F.R.D. 134, 138 (N.D. Ind. 1990) and (Cooter & Gell v. Hartmarx Corp., 496 U.S. 384,

393 (1990)) (internal citations and quotations omitted) (emphasis added).

*Contentions*

Defendants contend that the factual investigation conducted by Counsel for Plaintiffs

("Counsel") was unreasonable because Counsel: (1) was in possession of the allegedly defective

firearm since at least October of 2007, but failed to have it inspected by a firearms consultant

before he filed a products liability suit against Defendants on September 30, 2009; (2) failed to

have his own firearms consultant attend either of the two defense inspections on July 8, 2008 and

June 11, 2009; (3) ignored the objective physical evidence discovered at the June 11, 2009,

inspection which essentially refuted his client's claim that a bullet[1] dislodged from the side of the

pistol;  (4) filed a lawsuit alleging an injury caused by a defective product without ever obtaining

---

[1] The Court will later discuss why it was unreasonable for Counsel to characterize the projectile
that went through Plaintiff's left hand as anything other than a bullet.

an opinion that the product was defective, and (5) failed to provide his expert with sufficient information which would have allowed him to render a meaningful opinion.

Counsel contends that his inquiry into the facts was reasonable because he "interview[ed] the Plaintiffs and obtain[ed] the Police Investigation Report, medical records, and a statement from Mr. Williams." Brief in Opposition to Motion for Sanctions (Doc. No. 62 at 10). Counsel also looked at the gun and stated that it "was obvious, even to a lay person, that this evidence corroborated Plaintiffs' account of this incident." (Id.). Counsel asserts that Defendants have threatened to seek Rule 11 Sanctions from the outset of the case and have used it as a tool to harass and intimidate Plaintiffs into dropping their lawsuit. He argues that he was not required to disbelieve his client based merely on Defendants' contrary assertions and contends that Defendants disingenuously mischaracterized the evidence in this case because Plaintiff never claimed that "a bullet was discharged from the firearm, went sideways, exited the left side of the firearm, and struck his left hand." (Id. at 5). Finally, Counsel claims that he was not required to retain an expert prior to filing the Complaint because "[o]bviously" an expert retained at this early stage would not be "privy to discovery documents and other relevant materials." (Id. at 11).

II.    **Background**

In order to properly assess whether Counsel's inquiry into the underlying facts was reasonable under the circumstances, both prior to filing suit and thereafter, the Court must first consider the timeline of events to determine what information Counsel possessed and when he possessed it:[2]

---

[2] Specifically, the Court must analyze whether the assertions made in various documents submitted throughout the course of litigation were made with reasonable belief, formed after a reasonable inquiry under the circumstances, that they were well-grounded in fact.

- **August 13, 2007:**  Date of Incident/Pennsylvania State Police Incident Report (Doc. No. 61-6)
  - o  Incident occurred at approximately 12:30 p.m; Officer interviewed Plaintiff at JC Blair Hospital Emergency Room; *Plaintiff* told him: (i) he shot multiple shots and *when he was done he put the safety on*, and (ii) the gun went off when he started to transfer the gun from his right hand to his left; The report indicated that eyewitness David Williams ("Williams") could not provide any further details.
- **October 17, 2007:**  Counsel's Retention Letter to Defendants (Doc. No. 56-4)
  - o  Counsel advised that he had been retained to represent the interests of an individual who sustained serious injuries on April 13, 2007, while using one of their firearms; He alleged that the "firearm was defectively designed and/or manufactured," that it "lacked proper warnings," and that "the use of Zamak-3 in the composition of the slide and otherwise, caused the slide to so deform during the normal course of operation as to allow the cartridge casing and/or components of the firearm to forcefully contact [Plaintiff's] thumb and hand"; Counsel further advised that the *gun was in his possession and was available for review*.
- **February 15, 2008:**  Witness Statement of Williams (Doc. No. 56-5)
  - o  "I fired the first clip from the gun . . . . After I was done I gave the gun to Regis to use. *He fired his clip off, told me he put it on safe and was about to hand it back to me when it went off in hand.* Note-His hand was griping [sic] the ball [sic]- *Finger nowhere near triger* [sic]" (emphasis added); Plaintiff had an "entrince [sic] and exit hole from shell" and Williams stated that the gun maker was at fault because "*ammunition* does not exit the gun by way of triger [sic] houseing [sic]." (emphasis added).
- **July 8, 2008:**  First Defense Inspection of Pistol (Doc. No. 57)
  - o  Defendants travelled to Pittsburgh with their firearms consultant on July 8, 2008, to inspect the gun; Counsel did not have a firearms consultant present at this inspection; The inspection was cut short to allow a representative from Federal Cartridge Company ("FCC")[3] to be present because parts of the pistol needed to be removed in order to examine the interior components.
- **March 10, 2009:**  Counsel filed Praecipe for Writ of Summons (Doc. No. 1-2)
- **June 11, 2009:**  Second Defense Inspection of the Pistol (Doc. No. 56)
  - o  Defendants travelled to Pittsburgh with a firearms consultant on June 11, 2009, for a more detailed inspection of the interior components of the pistol; Counsel did not have his own firearms consultant present but arranged for pictures and videos of the inspection to be taken; The physical evidence revealed that there was *no interior damage to the "barrel, chamber, magazine, well or any of the internal components enclosed within the slide and frame at the spot through which Plaintiff claimed the bullet came out;"* The only damage to the firearm was around the trigger housing, the point where Plaintiff claimed the bullet came out.
- **July 23, 2009:**  Defendants' Telephone Interview with Plaintiff (Doc. No. 56)
  - o  According to the Sworn Declaration of John A. Tartaglia, an attorney for Defendants, Plaintiff told him "that a bullet discharged by the subject pistol went

---

[3] FCC originally was a Defendant in this case until Plaintiffs voluntarily dismissed them from suit on January 13, 2010.  See Notice of Dismissal (Doc. No. 18).

down toward the trigger and then out to the left, and that this bullet caused both the damage to the exterior of the left side of the pistol's slide and frame and the injuries he allegedly sustained to his hand;" Plaintiff *"clearly and unequivocally stated that he pulled the trigger* right before this bullet was discharged"; During this interview, Plaintiff never mentioned the slide being open 0.5 to 0.75 inches after he fired the seventh round. (See Doc. No. 61-2 at 136).

- **September 9, 2009: Defendant's Letter to Counsel (Doc. No. 56-8)**
  - o Defendants advised that they were unwilling to pay the $93,250 demand set forth in Counsel's August 12, 2009, letter because they determined that there was absolutely nothing defective with the pistol; Defendants stated that *"Beemiller, Inc. would be happy to review any expert opinions or thoughts on how the design or operation of the subject pistol was someone responsible for your client's injury"* and warned that they would seek *appropriate remedies if Counsel decided to move forward with the claim.* (emphasis added).

- **September 30, 2009: Complaint Served on Defendants (Doc. No. 1-3)**
  - o Counsel filed Complaint in Allegheny County Court of Common Pleas alleging that Plaintiff was injured by a defective firearm; Paragraph 11 stated that the gun "suddenly, and without warning, [ ] exploded and *shrapnel and/or a bullet and/or cartridge came through the slide and frame area* of the firearm violently striking the Plaintiff's left hand." (emphasis added).

- **October 21, 2009: Defendants Removed Case to Federal Court (Doc. No. 1)**

- **September 30, 2009: Counsel's Letter to William J. Bruchey ("Bruchey") (Doc. No. 56-12)**
  - o Three months after the June 11, 2009, defense inspection, Counsel provided Bruchey with pictures and videos of the inspection, told him to contact him after he had an opportunity to examine the materials and determine whether any additional materials and/or examinations were necessary and to minimize any costs associated with his examination.

- **October 26, 2009: Defendants Answer Complaint (Doc. No. 4)**
  - o The Answer includes as Defendants' *First Affirmative Defense* the allegation of a frivolous pleading; Defendants alleged that each and every single allegation in the Complaint lacked evidentiary support and provided notice that they would be moving for Rule 11 Sanctions at the appropriate time.

- **December 10, 2009: Defendants' Letter to Counsel Memorializing 12/9/2009 Conversation between Counsel & Defendants (Doc. No. 56-9)**
  - o Defendants reaffirmed their position that there was no defect, *warned Counsel that the claims his client was making were without any evidentiary support and that his client's version of the story was grossly inconsistent with the physical evidence*; Defendants noted how Counsel told them that prior to filing suit, he did not have a consultant or firearms expert examine the pistol and *was not told by any consultant or expert that the pistol was defective*; Counsel was urged to reevaluate his claim and to speak with his client to determine "what <u>really</u> occurred on the date of the incident" because the detailed inspection on June 11, 2009, clearly and unequivocally demonstrated that their claims of defect lacked evidentiary support (emphasis in original); Counsel was advised that *any further investigation or discovery would be futile* because it would not provide support

for their contentions; Counsel was *formally provided with notice that any further pursuit of these claims would result in Defendants filing for Rule 11 Sanctions*; Defendants also said they were considering *criminal remedies* against Mr. Ellis for filing a frivolous lawsuit. (emphasis added).

- **December 16, 2009: Counsel's Letter to Defendants (Doc. No. 56-10)**
  - o Counsel informed Defendants that he spoke with his client regarding the contentions outlined in their letter and that his client said that he "has accurately represented to the best of his knowledge what occurred on the date of the incident in question"; Counsel said he was trying to set up his own examination of the gun.
- **December 29, 2009:      Plaintiffs' First Inspection of Pistol (Doc. No. 56-13)**
  - o Two years and two months after Counsel was retained, and three months after he filed the Complaint, the first non-destructive inspection of the firearm and ammunition by Plaintiffs' own consultants took place.
- **July 9, 2010:      Plaintiffs' Expert Report (Doc. No. 39-4)**
  - o Lester Roane ("Roane") opined that an out of battery firing of a single non-defective round of ammunition caused the damage to the gun; this was based mainly on the damage to the frame and the placement of the bulge on the slide; they achieved an out of battery firing when the slide was 0.070 inches open but did not attempt to recreate the damage seen in the gun.
- **August 5, 2010: Counsel's Letter to Defendants Regarding Expert Report (Doc. No. 56-14)**
  - o Counsel produced the report in an attempt to facilitate a settlement; Counsel contended that the pistol was defective because it was capable of firing out of battery and that the "forensic evidence of the subject firearm makes it clear that it fired out-of-battery during the incident in question and caused the failure of the firearm"; *Counsel informed Defendants that they would be seeking punitive damages* because "Beemiller's continuing to sell this model of firearm after they knew of the design flaws that permit it to fire out-of-battery will likely be found by the Honorable Court to be willful and wanton conduct"; Counsel further stated that he hoped this report would persuade the Defendants to "view this matter in a more reasonable light" and make a settlement offer.
- **September 9, 2010:      Defendant's Letter to Counsel (Doc. No. 56-15)**
  - o Defendants again advised Counsel that they would not entertain any settlement discussions *because the physical evidence made clear that Plaintiffs filed a "patently frivolous lawsuit that is without any evidentiary support"*; Defendants requested date and time availabilities to schedule Plaintiffs' depositions.
- **October 21, 2010:      Defendants' Letter to Counsel (Doc. No. 56-16)**
  - o Defendants sent Counsel eight photographs of the testing they had conducted with Hi-Point C9 pistols; The pictures reflected what a Hi-Point C9 pistol looked like after it had been shot with another firearm; in light of the striking similarities in the  damage caused between the test pistol and the subject pistol, Defendants advised Counsel to compare the photographs of the test pistols with the photographs of the subject gun, share them with his experts, and advise them whether it would be necessary to continue with any of the scheduled depositions.
- **October 26, 2010:      Plaintiffs' Letter to Roane (Doc. No. 62-4)**

- o Counsel sent Roane a letter forwarding him the eight photographs of the test pistol that he had received from Defendants but did not describe what the photographs represented and did not identify them as pictures of Hi-Point C9 pistols that had been shot with other firearms.
- **February 1, 2011:**      **Plaintiffs' Response to Defendant's Request for Admissions (Doc. No. 51-6)**
  - o For the first time on record, Plaintiff **denied pulling the trigger** to discharge the eighth round of ammunition prior to the gun allegedly exploding in his hand; Plaintiff claimed to be "unaware" of whether his finger contacted the trigger prior to the discharge and therefore was unable to admit or deny this request.
- **July 27, 2011:**      **Plaintiff's Deposition (Doc. No. 61-2)**
  - o Plaintiff's testimony can be summarized as follows: Plaintiff and his friend Williams were taking turns target shooting with Williams' Hi-Point C9 pistol that he had brought to the campsite they were staying at for the weekend. Williams went first and fired off a clip of eight rounds before he handed the gun to Plaintiff with the safety on; Plaintiff fired seven rounds of ammunition, and right before he went to shoot his eighth round, he noticed that the slide was open approximately 0.5 to 0.75 inches; At this point, Plaintiff lowered the gun to the ground, took his finger off the trigger, took his left hand off of the gun, *and commented to Williams that he thought the gun was jammed*; As he was reaching towards the slide with his left hand to try to pull the slide back to clear the alleged "jam", the gun exploded as his left hand was parallel to the trigger housing; *Plaintiff claims that he never put the safety back on at any point prior to the "explosion" and was not trying to hand the gun back to Williams when the gun went off in his hand*;
  - o According to Plaintiff, at the time of the explosion, (i) he is "positive" that he never pulled the trigger, (ii) his hand was not in front of the muzzle, (iii) his finger was not touching the trigger and, if it had been, the tip of his finger would have been taken off, and (iv) the eighth round did not exit out of the muzzle, but instead, travelled "down" and "to the left" of the gun and exited "out of the trigger housing" (Doc. No. 61-2 at 102); Plaintiff "believes" that his injury was caused by a round of ammunition and stated that "it looked as if the round come through the trigger housing and hit me." He states that he did not see what went through his hand so his injury also could have been caused by gun fragments but he admits that there were no pieces of cartridge, metal, polymer or gun fragments of any kind found in his hand by any treating physicians or medical personnel upon his admission to the hospital; He admitted that he had an entrance and exit wound in his left hand and that his injury was treated "like [ ] a gunshot wound."
  - o Plaintiff believes that whatever went through his hand came out of the left side of the trigger housing, but said that it could have also come out of the right side; either way, Plaintiff maintained that whatever injured his hand came out of the trigger housing area of the pistol and NOT the muzzle; When asked where he thought the round went, he replied "Out of the trigger housing. That's the only thing I can think of, out of the side of the gun." (Doc. No. 61-2 at 103); Plaintiff has no recollection of his conversation with the Pennsylvania State Police Officer who interviewed him in the emergency room at J.C. Blair following the incident; As far as Plaintiff recalls, he never even spoke with the officer and does not recall

making the statements that were documented in the incident report (i.e., that "he shot multiple shots and when he was done he put the safety on" and that the gun went off when he "started to transfer the gun from his right hand to his left"); Plaintiff stated that Williams told him about a conversation that Williams had with the officer where the officer told Williams that "someone's got a lawsuit going with this gun" and that he "never seen a gun do that before."

- **July 28, 2011:   Williams' Deposition (Doc. No. 61-1)**
  - Williams' testimony can be summarized as follows: Plaintiff did not say anything to him prior to the gun "exploding" in his hand – *Plaintiff never made any comments to him about the gun being "jammed" and never indicated that there was any problem with the gun right before the incident*; Plaintiff may have been in the process of handing the firearm back to Williams at the time of the incident, and Plaintiff might have mentioned that the safety was on, but Williams cannot recall; When asked whether Plaintiff ever attempted to hand him the gun prior to the explosion, Williams stated "he was probably being in the process *because he was done firing it*. That would be the logical conclusion to hand it back to me, you know, but, you know, I think the pistol, I'm not sure what position the pistol is in, but all I know I seen it come flying right out of his hand"; Williams did not see where Plaintiff's hands were prior to the explosion - he heard a quick succession of shots, heard the shots stop, turned around and saw the gun flying out of Plaintiff's hand; After the incident, there were no bullets left in the gun; Williams stated that the officer said "virtually nothing" to him at the hospital and he denied that the officer told him that "somebody has a big lawsuit"; Williams asked the officer what he thought had happened and the officer replied that *he could not comment on the gun*; When asked if he disagreed with any statements he made in his February 15, 2008, Witness Statement, he stated "I would agree with [everything in there]" and that the information contained therein was "truthful and accurate" to the best of his knowledge

- **August 16, 2011:      Plaintiffs' Letter to Roane (Doc. No. 62-5)**
  - Counsel enclosed 20 different categories of documents, including the Deposition Transcripts of Plaintiff and Williams; Counsel also included the copies of the eight photographs provided by Defendants of what a Hi-Point C9 pistol looks like after it is shot by another firearm and *for the first time advised Roane as to Defendants' theory of the case*; Counsel explained that the Defendants' theory of the case was that (i) Plaintiff had his hand in front of the muzzle, shot himself as the bullet exited normally down the barrel  and out of muzzle and that someone altered the gun after the fact, or (ii) that the gun had been shot by another firearm while it was in Plaintiff's hand; Counsel requested that Roane review the attached documents to the extent he deemed necessary and *to supplement his original opinion in this case "by stating that you have reviewed these documents and then rendering an opinion regarding the above detailed defenses."*; Counsel asked Roane to determine the viability of the defenses by looking at the pictures and advised that *time was of the essence* because the deadline for the submission of pretrial statements was approaching. He did not advise Roane to conduct any similar testing in order to duplicate the results and/or analyze and refute Defendants' theory of the case.

- **September 16, 2011**:   **Roane's Email to Plaintiffs' Counsel (Doc. No. 62-6)**
  - *"I have just speed-read through the material you sent me a couple of weeks ago. There is nothing in there that would cause me to change my opinion about the cause of the incident."* (emphasis added); The "material" Roane was referring to included 20 categories of documents - he did not refer or even allude to the eight photographs of the test pistol or Plaintiff's deposition testimony.
- **September 19, 2011**:   **Plaintiff's Pretrial Statement (Doc. No. 39)**
  - Counsel listed Roane and Bruchey as experts and alleged that Plaintiff "experienced an 'out of battery' firing which caused the subject handgun to catastrophically fail" and that a "portion of the handgun exploded causing *shrapnel and/or part of the ammunition* to violently strike the plaintiff in his left hand." (emphasis added).
- **October 17, 2011**:   **Roane Deposition (Doc. No. 56-3)**
  - Roane's testimony can be summarized as follows: "I don't know the facts of the case. I just know what I received, [] the gun, and I was told that someone was injured"; Roane *thinks* he had a general discussion regarding the facts of the case with Counsel but did not have any specific recollection of it and did not know any of the circumstances surrounding the injury and did not know what Plaintiff's injury was; Counsel provided him with the subject pistol and an exemplar pistol and instructed him to examine and compare the two firearms, *determine the cause of the damage to the gun, and prepare a report; Roane was never instructed by Counsel to try to recreate the damage to the exemplar firearm that was seen in the subject firearm*; His examination of the incident firearm revealed that there was no deformation of the barrel and no deformation of the chamber, the magazine was functional and intact, there was no damage to the chamber of the barrel or to the trigger bar, no damage to the feed ramp or the grip; Roane stated that one of the things that he was looking for to see if the accident was caused by an "over-pressurized round" was the magazine and the grips and the fact that the magazine was intact and the fact that the grips were not blown out indicated to him indicated that the damage was not caused by excessive pressure; *When asked what happened to the eighth bullet, Roane replied "I have no idea. I assume it came out of the end of the barrel and went somewhere"; Roane stated that he was never asked to determine where the bullet exited from*; When asked if he could see anywhere else that a bullet could have come out of the gun other than a muzzle, Roane replied "no" and *confirmed that a "bullet is not going to come out of the [left or right] side of the gun," or "out of the trigger guard" or "out of the magazine well"*; In response to a question that a bullet is "certainly not going to come -- go down halfway through the barrel, make a right turn and go out," Roane replied "That's correct."
  - Roane opined that damage to the gun was caused by "a round fired out of battery" and explained that he conducted testing using the exemplar gun and primed cases, instead of live rounds of ammunition, and discovered that the pistol would fire out of battery if the slide was open .070 inches but would not fire out of battery if the slide was open more than .070 inches; Roane testified that he had to pull the trigger to achieve the out of battery firing, that he never conducted any testing to determine whether an out of battery firing could occur without the trigger being

12

pulled but that he did not think that a discharge could occur without a trigger pull; Roane *did not conduct any testing to recreate the incident*- because Counsel did not ask him to; *Roane never conducted any testing to determine whether an out of battery firing could account for the type of damage that was caused in the incident pistol* and testified that *he would be speculating if he said that the damage to the incident pistol was caused by an out of battery firing.*

o Roane admits that he was informed of the defense's theory that the gun was shot by another firearm but states that he was never asked to determine the viability of that theory because Counsel did not tell him about the theory until approximately August of 2011 and by that time his report was already complete and he no longer was in possession of the gun; Aside from Counsel telling Roane about the theory, he never actually discussed it with him; Roane has never considered the possibility that the incident pistol was shot by another firearm.

o Although Counsel sent Roane the eight photographs of the testing conducted by Defendants of what it looks like when a Hi-Point C9 pistol is shot by another firearm, Roane could not recall the purpose of why Counsel sent him those pictures and could not testify accurately as to what those pictures purported to represent; *Roane testified that he thought the eight photographs were "photographs of the damage to the [incident] gun" because "it certainly looks like [the same gun]" that he examined*;

o Counsel informed Roane the morning of his deposition and prior to the arrival of defense counsel that *Plaintiff had changed his story at his deposition* and testified that *he did not pull the trigger* even though, prior to his deposition, Plaintiff had told Counsel "*in interview after interview, after interview . . . that he pulled the trigger*"; Roane testified that Counsel told him that "in his discussions with the client early on that he said he pulled the trigger. I think he told me that the client had told the police that he pulled the trigger. And then in his deposition he said that he didn't."[4]

- **November 17, 2011: Roane's Email to Plaintiffs' Counsel (Doc. No. 62-7)**
  o Informed counsel that some "year-end cleaning" turned up several categories of documents which he was unable to find at the time of his deposition, including the transcripts of Plaintiff's and Williams' Depositions, the Complaint, CD/DVDs marked "Ellis Video 1" and "Ellis Video 2," and Defendants' eight photographs, which he identified as "eight fuzzy color photos of the *incident pistol* details." (emphasis added).

- **November 17, 2011: Counsel's Email to Defendants (Doc. No. 62-7)**
  o Counsel advised Defendants that Plaintiffs agreed to withdraw their expert (Roane) "to save both parties the time and expense of a Daubert Hearing and Daubert Motions."

---

[4] Plaintiff's statements about pulling the trigger fall within the "admission by party-opponent" exception to the hearsay rule. See Pa.R.E. 803(25); see also Commonwealth v. Laich, 777 A.2d 1057 (Pa. 2001). Furthermore, Roane's conversation with Counsel is not being considered to establish the truth of the matter (i.e. whether Plaintiff actually pulled the trigger), but to determine Counsel's knowledge and to establish what information he possessed at a certain point in time.

- **November 17, 2011: Counsel filed Amended Pretrial Statement (Doc. No. 47)**
  - Counsel dropped Roane and Bruchey as their experts, yet retained their theory that Plaintiff "experienced an 'out of battery' firing which caused the subject handgun to catastrophically fail." Counsel also stated that a "portion of the handgun exploded causing *shrapnel and/or part of the ammunition* to violently strike the plaintiff in his left hand." (emphasis added).

## III. Findings

As discussed earlier, Rule 11 imposed an affirmative duty upon Counsel to ensure that he conducted a reasonable investigation into the factual underpinnings of his clients' claim both prior to filing suit and thereafter to ensure that his submissions to the Court were factually well-grounded. After a detailed review of the record, the Court finds that Counsel filed several documents in violation of this rule and agrees with Defendants that Rule 11 sanctions are warranted in light of the circumstances which indicate that Counsel unreasonably investigated the facts of his client's case at all points throughout this litigation.

### A. The Unreasonableness of Counsel's Pre-Filing Inquiry

Against the backdrop painted above, the Court has little difficulty in finding that Counsel failed to conduct a reasonable inquiry into the underlying facts prior to filing suit.[5] The timeline establishes that Counsel filed the Complaint on September 30, 2009, alleging, among other things, that Defendants had manufactured and distributed a defective firearm which injured his client on April 13, 2007. Paragraph 11 of the Complaint specifically alleged that, after Plaintiff fired "a number of shots," the firearm, "suddenly and without warning," "exploded and *shrapnel and/or a bullet and/or cartridge came through the slide and frame area of the firearm* violently striking the Plaintiff's left hand." Complaint (Doc. No. 1-3 at 5) (emphasis added). The

---

[5] Although the Court finds that Counsel's pre-filing inquiry was unreasonable under the circumstances, it cannot consider the Complaint as a document submitted in violation of Rule 11 because it originally was filed in state court. See Griffen v. City of Oklahoma City, 3 F.3d 336, 339 (10th Cir. 1993). However, sanctions may be imposed for documents filed in violation of Rule 11 which were submitted to the Court subsequent to removal. See id. at 339.

problems underlying the assertion in Paragraph 11 are two-fold: First, Counsel - despite the fact

that he had been in possession of the firearm for nearly *two years* before filing suit - lodged this

allegation without ever having the gun inspected by his own firearms consultant and without ever

receiving any sort of preliminary determination that the gun possibly was defective; Second,

Counsel had no reason to believe that shrapnel went through his client's hand because the

medical records conclusively established that Plaintiff sustained a "through and through," "bullet

injury" to his left hand/thumb.

*Failure to Conduct Independent Inspection of Firearm*

Indeed, it is Counsel's decision to forego his own inspection of the allegedly defective

firearm that primarily forms the basis for the Court's finding that Counsel unreasonably

investigated the facts of his client's case prior to filing suit. Factors which the Court finds

particularly relevant in highlighting the unreasonableness of Counsel's conduct include: (1) the

time Counsel had to independently investigate his client's account of the incident; (2) the

opportunity he had to attain relevant information; and (3) Counsel's heavy reliance on his client

to supply the facts, despite the contrary objective physical evidence. See CTC Imports, 951 F.2d

at 573. As the Third Circuit explained:

> These factors often function inversely: The shorter the time the more
> reasonable it is for an attorney to rely on the client .... If an attorney is not
> allowed to reasonably rely on his client in circumstances where *time is of the
> essence*, then no attorney is safe in filing an emergency pleading.

Id. at 573 (emphasis added).

Time

As the timeline above establishes, time was not of the essence in this case. To the

contrary, Counsel was retained at some point in October of 2007, by a client who sought to claim

that he was injured by a gun that spontaneously exploded in his hand and caused a bullet to exit

15

from the side of the gun, and not the muzzle. He notified Defendants of his retention on October 17, 2007, and told them the allegedly defective firearm was in his possession and was available for review. Defendants took Counsel up on his offer and arranged for two different inspections of the firearm to take place prior to the filing of the Complaint. The first inspection occurred on July 8, 2008, but, as explained earlier, was cut short. The second inspection took place on June 11, 2009, and a detailed examination of the interior components of the gun was conducted by Defendants' firearms consultant. For reasons that remain unclear, Counsel did not bring his own firearms consultant to either inspection and apparently determined that it would be unnecessary to hire his own firearms consultant to examine the gun at any point in the two years prior to his filing suit.[6]

The June 11, 2009, inspection of the firearm at best raised serious concerns regarding the veracity of Plaintiff's story and at worst completely refuted Plaintiff's account of the incident because the physical evidence revealed that the interior components of the gun were not damaged and were very much intact, indicating that the bullet could not have exited the firearm from anywhere other than the muzzle. Realizing that Counsel had absolutely no evidentiary support for the allegations he was lodging, Defendants, by letter dated September 9, 2009, rejected the settlement demand of $93,250 and informed Counsel that they were unwilling to settle because the inspection made clear that "there was absolutely nothing defective with the firearm in question." (Doc. No. 56-8). Defendants stated that they would be happy to review any expert opinions to the contrary and cautioned Counsel that "*if Mr. Ellis proceeds any further with this matter, Beemiller, Inc. will seek all appropriate remedies available to it*." (Id.) (emphasis added).

---

[6] Instead, Counsel arranged for photographs and videos of the inspection to be taken.

Instead of realizing that there were red flags in the air and that an inspection with his own firearms consultant would be necessary to attempt to discredit the June 2009 inspection and garner objective evidentiary support for his defect claim, Counsel filed suit. Counsel filed suit without even sending the pictures and videos of the June 2009 inspection to his firearms consultant, whom he had been in touch with since at least March of 2009, until three months later, on the same day that he served the Complaint. Counsel filed suit despite the fact that he had filed a Praecipe for Writ of Summons on March 10, 2009[7] to alleviate concern regarding the two-year statute of limitations period which was set to expire on April 13, 2009.[8] This, in effect, provided Counsel with an <u>additional</u> two years[9] to investigate his client's story and have the gun examined by his own consultant. Despite this abundance of time to ensure the legitimacy of his client's claim, and despite the warnings he was given, Counsel chose not to conduct any further investigation into whether the firearm was actually defective and instead opted to initiate a lawsuit based on nothing more than his client's own self-serving and uncorroborated allegations of product defect. The Court finds that this conduct was unreasonable, if not reckless.

Opportunity

Another compelling factor to consider was the opportunity Counsel had to attain the requisite evidence given the fact that he had been in possession of the allegedly defective product

---

[7] Defendants were served with the Praecipe for Writ of Summons on April 7, 2009 in accordance with Pa. R. C. P. (401)(a). <u>See</u> (Doc. No. 1-2).

[8] The incident occurred on April 13, 2007 and product liability claims are governed by a two-year statute of limitations period. <u>See</u> <u>Tohan v. Owens-Corning Fiberglas Corp.</u>, 696 A.2d 1197 (Pa. Super. 1997).

[9] The filing of a Praecipe for Writ of Summons tolls the limitations period from the date of the filing for a period of time equivalent to the applicable statute of limitations period. <u>See</u> <u>Witherspoon v. City of Philadelphia</u>, 768 A.2d 1079 (Pa. 2001); <u>see also</u> <u>Fike v. Ball</u>, 338 A.2d 619 (Pa. Super. 1975).

since his retention in October of 2007. The purported reason Counsel provides for not retaining an expert in the two years before he filed suit is because "[o]bviously, an expert retained prior to drafting a Complaint would not be privy to discovery documents and other relevant materials." Brief in Opposition to Motion for Sanctions (Doc. No. 62 at 11). Counsel makes no attempt to inform the Court which particular "discovery documents" and "relevant materials" were needed to inform his expert and guide his analysis and the Court cannot fathom how any paper documents could be more relevant to a determination that his client was injured by a defective product than the <u>actual</u> <u>product</u> <u>itself</u>. Counsel's assertion, while not inaccurate as a general proposition, is completely inapposite as applied to these facts because this clearly is not a case where discovery was needed to obtain the salient information and materials from the other party's possession. <u>See</u> <u>Kamen v. American Tel. & Tel. Co.</u>, 791 F.2d 1006, 1012 (2d Cir.1986) (counsel's "reliance on the information supplied by his clients was reasonable" where "the relevant information was largely in the control of the defendant,"; <u>see</u> <u>also</u> <u>Morda v. Klein</u>, 865 F.2d 782, 785-86 (6th Cir. 1989) ("It would be particularly difficult to fault plaintiffs for a lack of prefiling inquiry when, as here, defendants have refused plaintiffs access to material information that would bear on certain allegations made in the complaint.").

Counsel had the gun, the only piece of evidence which any consultant or expert would need in determining the existence of a defect. The probability that a pre-filing inspection of the firearm would have turned up important evidence was *substantial*, thus rendering Counsel's failure to conduct such an investigation inexcusable.

Reliance

Counsel evidently believed he could file a products liability lawsuit on the strength of his client's allegations, and essentially nothing more.[10] In light of the fact that Counsel had an abundance of time and every opportunity to determine whether the gun was defective from at least a preliminary standpoint, the Court finds that his heavy reliance on his client's story was completely unreasonable. Counsel contends that he was not required to disbelieve his client because of Defendants' contrary contentions, but this argument is misguided because it is not Defendants' argument, but the actual physical and medical evidence which should have given him cause for concern. Furthermore, given the nature of the allegation – that a bullet dislodged from the side of the gun – it was unreasonable for Counsel to file a lawsuit on the strength of an implausible claim that lacked evidentiary support.

Counsel's reliance on his client's account of the incident is made all the more unreasonable in light of Williams' eyewitness statement, which provides a much different account of what happened. Indeed, Williams stated that Plaintiff had already fired his clip off and told him that *he had put the safety back on* and was about to hand it back to Williams when it allegedly exploded in his hand. See (Doc. No. 56-5).[11] He also alleged that Plaintiff's hand was nowhere near the trigger at the time of the explosion, an allegation which the Court finds sufficient to put Counsel on notice that the allegation was that a bullet exited out of the side of the gun without the trigger being pulled. At the very least, Counsel should have realized the material inconsistencies in the stories, and the Court fails to understand how reviewing this

---

[10] The Court finds that Williams' account of the incident fails to sufficiently corroborate Plaintiff's story because Williams did not see where Plaintiff's hands were at the time of the explosion – he just turned around and saw the gun flying out of his hand.

[11] Plaintiff, at his deposition, disputed this account of the incident and testified that he never put the safety back on and was not in the process of handing the gun back to Williams before the alleged explosion.

document did not provoke Counsel to obtain his own examination of the firearm before he

hauled Defendants into court.

### Bullet or Shrapnel?

As touched on earlier, the Complaint would have constituted a triggering document if it

originally had been filed in federal court because Paragraph 11 asserts that shrapnel could have

struck Plaintiff's hand.[12]  Counsel represented that he reviewed the medical records as part of his

pre-filing inquiry into the facts, which is puzzling, because the medical records do not contain a

---

[12] Although the Complaint cannot constitute a triggering document, the Court finds that every document submitted by Counsel thereafter which contained the statement that Plaintiff's hand was injured by shrapnel was filed in violation of Rule 11 because Counsel could not have formed a reasonable belief that the allegation was well-grounded in fact given the lack of objective evidence to support it. See Fed.R.Civ.P. 11, Advisory Committee Notes (discussing how a "litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those [documents] after learning that they cease to have any merit."). These triggering documents include: Plaintiff's Pretrial Statement (Doc. No. 39 at 2) ("A portion of the handgun exploded causing *shrapnel and/or part of the ammunition* to violently strike the plaintiff in his left hand"); Plaintiff's Amended Pretrial Statement (Doc. No. 47 at 2) (same assertion); Brief in Opposition to Motion for Summary Judgment (Doc. No. 61 at 11) ("Plaintiff's position, that he is unaware whether it was the bullet, a piece of shrapnel and/or part of the cartridge that traveled through his hand when the firearm exploded, was set forth in paragraph 11 of Plaintiff's Complaint and has remained constant throughout this case."); Brief in Opposition to Motion for Sanctions (Doc. No. 62 at 5) ("Regis Ellis fired seven shots from the subject firearm before it malfunctioned and exploded forcing a cartridge, bullet, and/or shrapnel from part of the subject firearm to travel through his hand and seriously injure him."); Sur-Reply Brief in Opposition to Motion for Sanction (Doc. No. 66) ("It is not within the province of a lay person to determine whether a projectile which damages human bone and tissue is a bullet, another part of the cartridge, or a piece of the pistol itself."); Joint Statement of Undisputed Materials Facts (Doc. No. 51) (Paragraph 12: "Plaintiffs dispute the bullet from the eighth round of ammunition was discharged by the pistol into the plaintiff's left hand because he testified that he does not know whether his left hand was struck by a bullet or a piece of the pistol") (Paragraph 15: "Plaintiffs contend that Defendants have not set forth actual evidence which tends to make their bald assertion that shrapnel could not have caused plaintiff's injuries any more likely. Defendants have set forth no evidence supportive of this assertion."). The Court is bewildered by Counsel's assertion in this last paragraph, as Counsel is the one who has completely failed to set forth actual competent evidence which tends to make his bald assertion that shrapnel *could have* caused the entrance and exit wound any more likely. His own client testified that no fragments of the cartridge case, bullet, polymer, or metal were found in his hand. (Doc. No. 61-2 at 95-96).

single statement which would support a finding that *shrapnel* caused the injury to Plaintiff's hand. Indeed, the overwhelming medical evidence of record establishes, by more than a preponderance of the evidence, that Plaintiff suffered a "through and through" "bullet injury" with an "entrance and exit wound."[13] Thus, the only piece of "evidence" which contradicts the medical records and the finding that a bullet went through Plaintiff's hand is his client's own speculative and unsubstantiated theory.

Moreover, although Counsel indicated that he obtained a statement from Williams as part of his pre-filing investigation, the Court fails to see how anything in this statement corroborated Plaintiff's theory that his hand could have been injured by shrapnel. Indeed, while Williams relayed that Plaintiff's hand had an *entrance and exit hole from the shell* and that he thought the gun makers were at fault because *ammunition* does not exit the gun *by way of the trigger housing*. See (Doc. No. 56-5 at 2). Thus, Williams' statement only further reinforces the fact that the theory involved a bullet exiting out of the side of a gun and going through Plaintiff's hand; if Counsel's investigation included obtaining this witness statement, then this in conjunction with Plaintiff's medical records should have made clear that Counsel could not waltz into court without any objective physical evidence to support this assertion.

---

[13] See e.g., J.C. Blair Hospital Emergency Department Report (Doc. No. 56-4) at 2 ("This is a 43-year old male patient who experienced an accidental discharge of a 9-mm handgun, causing a **bullet injury** to the thenar area of the lend hand. He has an **entry wound** on the palmar surface and an **exit wound** behind the metacarpal bone . . . **Diagnosis: Gunshot wound** to the left hand.") (emphasis added); Radiology Report (Doc. No. 56-4) at 3 (". . . 43 year old with **gunshot wound to thumb**.") (emphasis added); Allegheny Chesapeake Physical Therapy Care Plan (Doc. No. 39-1) at 1 ("Patient reports suffering an **accidental gunshot wound** injury due to malfunction of the gun.") (emphasis added); UPMC Plastic Surgery Report (Doc. No. 39-2) at 1 ("Status **post gunshot wound** to left thumb with left thumb metacarpal comminuted fracture . . . patient is a 45-year old right-hand dominant man who was manipulating a handgun when it discharged into the thenar eminence of the left hand . . . . There was a **through-and-through gunshot wound** with one wound on the left thenar eminence and the other wound on the dorsal aspect of the thumb metacarpal") (emphasis added).

Thus, an analysis of the circumstances which existed prior to the filing of the Complaint demonstrates the unreasonableness of Counsel's heavy, if not blind, reliance on his client's story because Counsel had *more than enough* time and opportunity to obtain an *independent* account of what occurred by arranging for his own inspection of the gun. Counsel failed to independently investigate his client's claim despite the fact that he was the one who was in the position to obtain such information and despite the warning signs that there were serious issues with his client's version of events.[14] The Court therefore concludes that Counsel's pre-filing inquiry was unreasonable under the circumstances.[15]

### B.   The Unreasonableness of Counsel's Post-Filing Investigation

As discussed earlier, Counsel's duty under Rule 11 to ensure that each and every submission to the Court contained assertions that were reasonably believed to be well-grounded in fact continued after he initiated suit. See Ideal Instruments, Inc. v. Rivard Instruments, Inc., 243 F.R.D. 322, 342 (N.D. Iowa 2007) ("The duty of a party to assess the viability of a claim is not measured solely at the time that the claim was filed, but is a continuing one"). Again, in

---

[14] Nor is Counsel's pre-filing inquiry saved by the fact that he merely looked at the gun. Counsel takes the position that casual observation of the gun made it "obvious, even to a layperson, that this evidence corroborated Plaintiff's account of the incident." (Doc. No. 62 at 10). Contrary to Counsel's belief, casual observation does not enable one to decipher whether a bullet could dislodge from the trigger housing of a gun, especially without pulling the trigger.

[15] Counsel's contention that Defendants were wielding Rule 11 Sanctions from the inception of the case as a tool to intimidate and harass them into dropping their case is unpersuasive and can be disposed of in short order: Defendants threatened to move for Rule 11 Sanctions in their Answer because at the time the Complaint was filed, they had already conducted a detailed examination of the gun and determined that no defect existed and had *already warned* Counsel that it would seek appropriate remedies if he moved forward with the suit without gathering objective evidentiary support. Thus, this was not an attempt to play hardball, but an attempt to provide sufficient notice that they will be seeking relief as a result of Counsel's decision to force them into defending against a claim which was, and had always been, completely unsupported by the objective evidence of record.

analyzing whether a given document triggers Rule 11 sanctions, the Court must focus on what was reasonable to believe at the time of its submission. See CTC Imports, 951 F.2d at 578.

*Plaintiff's Pretrial Statement Violates Rule 11*

On September 19, 2011, Plaintiff filed a Pretrial Statement alleging that, on the day of the incident, "Plaintiff Regis Ellis experienced an 'out of battery' firing which caused the subject handgun to catastrophically fail. A portion of the handgun exploded causing shrapnel and/or part of the ammunition to violently strike the plaintiff in his left hand." (Doc. No. 39 at 2). In addition to containing the unsubstantiated shrapnel allegation, the Court finds that this assertion was not made with reasonable belief that it was well-grounded in fact because at the time it was made: (1) it was conclusively established through Plaintiff's deposition testimony that an out of battery firing could not have caused the damage to the firearm, and (2) it was unknown whether the damage to the gun was caused by another firearm because Counsel failed to investigate and refute Defendants' theory, despite having nearly a year to do so.

First, Plaintiff's deposition should have made it crystal clear that it was unreasonable to rely on the out of battery firing theory and on him in moving forward with the case. Plaintiff: (i) provided testimony which conflicted with Mr. Williams' testimony,[16] (ii) conveniently could not recall the statements he made to the Pennsylvania State Police Officer at the hospital right after

---

[16] For example, Williams testified that Plaintiff never commented to him that he thought the gun was jammed before the explosion, that the police officer never told him (Williams) that something "somebody has a big lawsuit" after looking at the gun or that he has never seen a gun do that before in his life – Williams testified that the officer barely spoke with him at the hospital and would not comment on the gun. Williams also testified that he had no reason to doubt the accuracy or truthfulness of the statements he made in his Witness Statement.

the incident occurred,[17] and (iii) alleged that the slide was open 0.5 to 0.75 inches for the first

time and that he did not pull the trigger.[18]

Indeed, Roane's expert report which set forth the out of battery firing theory was dated

July 9, 2010, and Plaintiff's deposition took place a year later on July 27, 2011. Plaintiff's

testimony effectively negated the theory of an out of battery firing because he testified that the

slide was 0.5 to 0.75 inches open and that he did not pull the trigger, while the report indicated

that an out of battery firing was achieved only at 0.070 inches and only when trigger is pulled.[19]

Counsel appeared to be surprised when Plaintiff testified at his deposition that he did not pull the

trigger, yet there is no evidence that he specifically brought the damaging portions of Plaintiff's

testimony to his expert's attention to determine whether their out of battery firing theory still

held water under the facts his client had attested to.[20] Counsel, without ever discussing the effect

of his client's testimony with his expert, and despite the fact that his client was now claiming that

he never pulled the trigger, filed this document alleging, without any actual evidence, that an out

of battery firing was the cause of the incident.

---

[17] The incident report indicates that the officer spoke with Plaintiff and Plaintiff told him that he had had fired multiple shots and when he was done he put the safety on and that the gun went off as he was transferring the gun from his right hand to his left. Williams also recalled this version of events at his deposition, and provided nearly the same account of the incident in his February 15, 2008, Witness Statement.

[18] Plaintiff also testified that a third party from one of the university's had contacted him with questions regarding whether he altered the firearm at any point. See (Doc. No. 61-2 at 130).

[19] Defendants' proposed expert watched the video of Roane's testing and noted that the trigger was pulled during the testing. See (Doc. No. 45-2 at 11). Roane confirmed that he had to pull the trigger to achieve the out of battery firing at his deposition.

[20] The record indicates that the deposition of Plaintiff and Williams were sent to Roane on August 16, 2011, in the correspondence which included 20 overall categories of documents.

At the time Counsel filed the Pretrial Statement, he also was well aware of Defendant's

theory that the pistol was shot by another firearm. Defendants informed Counsel of their theory

on October 21, 2010, by sending him the eight color photographs of the testing that Beemiller,

Inc., had conducted. These photographs illustrated the *striking similarities* between the incident

pistol and the test pistol that was shot by another firearm. Given the uncanny resemblance

between the incident pistol and Defendants test pistol with respect to the damage to the

frame/slide area, Defendants advised Counsel to compare the pictures with the incident pistol,

share them with his experts, and advise them as to whether it would be necessary to move

forward with the case. Counsel, however, did not actually inform his expert of the Defendant's

"shot by another gun" theory until nearly a year later on August 16, 2011, in a correspondence

which also disclosed 19 other categories of documents.[21] See (Doc. No. 62-5 at 3). In this letter,

Counsel relayed Defendants' theory, asked Roane to review the (20 different) "attached

documents" to the extent Roane deemed necessary, and requested that he supplement his

---

[21] Although Counsel sent Roane the pictures on October 26, 2010, the letter they were attached
to did not identify what the photographs represented or explain Defendants' theory. See (Doc.
No. 62-4). The subject line only stated that they were "Photographs of Testing conducted by
Beemiller, Inc." and gave the case name. (Id.). The body of the letter only states: "Enclosed
please find photographs I received from Mr. Renzulli. Should you have any questions or
concerns, please do not hesitate to contact my office." (Id.). Indeed, at his deposition, Roane
thought these pictures were of the incident pistol. See (Doc. No. 56-3 at 8). In this respect, the
Court finds that Counsel failed to provide his expert with the salient facts of the case which
would have allowed him to render a meaningful opinion that fit the facts of the case. Counsel did
not ask Roane to recreate the damage seen on the subject pistol on his exemplar gun in order to
assess whether an out of battery firing could cause that particular kind of damage to the gun.
Roane was only charged with the duty of determining the damage to the firearm, was not
specifically and/or adequately informed of the injury sustained or of the allegation that a bullet
travelled out of the side of the gun without the trigger being pulled while the slide was 0.5 inches
open, and was never asked to conduct testing to refute Defendants' theory of the case. See (Doc.
No. 56-3 at 4-7, 11). It's clear that Counsel did not want to spend the money to attain the
evidence he needed and his failure to provide Roane with enough information to test out the
viability of his client's allegation is another illustration of his unreasonable investigation of this
case.

"original opinion in this case by stating that you have reviewed these documents and then rendering an opinion regarding the above detailed defenses." (Id.). Counsel further stressed that "time is of the essence" because of the looming August 25, 2011, deadline[22] for the submission of Plaintiff's Pretrial Statement. (Id.).

It is unfathomable how Counsel could expect his expert to render a meaningful supplemental opinion regarding the viability of Defendants' theory (1) without conducting similar testing, (2) with only one week's notice, and (3) with such notice being buried in a letter which had 19 other categories of documents attached to it. Asking Roane to merely compare the pictures of the incident pistol and Defendants' test pistol is hardly sufficient to refute Defendants' theory of what caused the damage to the gun.[23] The Court is unclear as to how Counsel could have expected his expert to conclusively establish that Defendants' theory was without merit without conducting similar testing, or any testing at all.

Moreover, Counsel did not even receive word from his expert until September 16, 2011. See (Doc. No. 62-6). When his expert did finally respond to his August 16, 2011, letter, he did not even address Defendants' theory, and merely stated "I have just *speed-read* through the *material* you sent me a couple of weeks ago. There is nothing in there that would cause me to change my opinion about the cause of the incident." (Id.) (emphasis added). Surely Counsel must have understood that this hardly could be called a supplemental opinion - Roane did not

---

[22] The record reflects that the actual deadline for Plaintiff's submission of their Pretrial Statement was September 19, 2011. See (Doc. No. 33)

[23] The fact that he did not ask Roane to conduct similar testing in an attempt to refute Defendant's theory is even more troubling in light of Counsel's contention that he had always viewed this case as a product malfunction theory case. If he has "always viewed this case as a malfunction case," then he should have fully recognized that he needed to refute this secondary theory in order to establish a prima facie case under the product malfunction theory. See Brief in Opposition to Motion for Sanctions (Doc. No. 62 at 10).

even so much as allude to Defendants' theory or specifically indicate that he gave it a passing thought.[24] His "supplemental opinion" set forth absolutely no support for why Defendant's theory did not change his opinion.

The Court finds that Counsel's decision to forego similar testing to refute Defendants' theory was made all the more unreasonable in light of the fact that Defendants' eight photographs of the test pistol contained images that were nearly indistinguishable from the pictures of the incident pistol. Indeed, the viability and strength of Defendants' theory is actually demonstrated through Counsel's own expert, who was *unable to distinguish between the subject pistol and the test pistol* in Defendants' eight photographs on two separate occasions. The first occurred at his October 17, 2011, deposition, when Defendants presented Roane with a copy of Counsel's October 26, 2010, letter which indicated that Counsel was disclosing to Roane Defendants' eight photographs of the test pistol that was shot by another firearm. See (Doc. No. 56-16). When Roane was asked to identify the eight photographs attached to the letter, he testified that "it's photographs of the damage to the gun. Very poor photographs, but they are." (Doc. No. 56-3 at 8). Roane further testified that he did not know why Counsel him sent him these photographs and that the pictures "certainly" "looked like the incident gun" that he examined because he "didn't see anything in there that was new or exciting." (Id.) When asked by Defendants whether the eight photographs formed the basis for any of his opinions in this case, Roane replied that they "are old news. I mean they appear to be photographs of the gun that I examined. And they didn't convey any new information." (Id.)

---

[24] Indeed, Roane testified at his October 17, 2011, deposition that he was never asked to determine whether or not the gun was shot with another gun, that Counsel informed him of the theory only a few months prior but that he did not go back to look at the incident firearm to see if it could have been shot by another firearm. He testified that he never actually did anything to determine whether or not Defendants' theory was correct. See (Doc. 56-3 at 7-8).

The second occasion where Roane confused the pictures of Defendants' test pistol with the actual gun occurred in an email he sent to Counsel on November 17, 2011, apologizing for his inability to find certain materials at the time of his deposition. He listed several items that turned up during "some year-end cleaning" and among these items were Defendants' photographs, except that Roane called them the "[e]ight fuzzy color photos of the *incident pistol details*." (Doc. No. 62-7) (emphasis added). Thus, Counsel could not have reasonably believed that an out of battery firing caused the incident at the time he filed the Pretrial Statement because (1) his own client's testimony made clear that it was physically impossible and (2) he never refuted an alternative, reasonable secondary cause for the damage to the gun identified by Defendants. Therefore, the Court finds that the Pretrial Statement was filed in violation of Rule 11.

### *Plaintiff's Amended Pretrial Statement Violates Rule 11*

After Roane's October 17, 2011, deposition, it should have been *abundantly clear* that there was absolutely no objective evidentiary support for Plaintiff's claim and that dismissal was appropriate.[25] At this point in time, Counsel had no more evidentiary support for his client's claim than he did before he filed the Complaint. Instead, Counsel filed an Amended Pretrial Statement on November 17, 2011, dropping Roane and Bruchey as his expert witnesses, but retaining their out of battery firing theory. Indeed, the Amended Pretrial Statement contained the same allegation as the original: "Plaintiff Regis Ellis experienced an 'out of battery' firing which caused the subject handgun to catastrophically fail. A portion of the handgun exploded causing

---

[25] The material facts of Roane's deposition established that: (1) it was not possible for the gun to fire out of battery when the slide is open more than 0.070 inches, (2) the gun could not fire out of battery without pulling the trigger, and that (3) an out of battery firing would not cause a bullet to exit from the side of the gun. Roane also testified that the out of battery firing theory was speculative and confirmed that he did not do any testing to determine whether it could account for the kind of damage seen in the incident pistol.

shrapnel and/or part of the ammunition to violently strike the plaintiff in his left hand." (Doc. No. 47 at 2). In addition to violating Rule 11 because it contained the shrapnel allegation, the Court finds that this assertion could not have been made with reasonable belief that it was well-grounded in fact because at the time it was made it was conclusively established that an out of battery firing could not have caused the physical damage to the gun and could not have occurred under the circumstances testified to by Plaintiff.

*Assertions in Counsel's Briefs Violate Rule 11*

As the Court discussed earlier, it was unreasonable for Counsel to assert that anything other than a bullet went through his client's hand; therefore, the Court found that every document which advanced the shrapnel theory constituted a triggering document. As outlined earlier, this includes every brief that Counsel filed with the Court. The Court will not rehash the unreasonableness of the shrapnel assertion, but does wish to comment on Counsel's unsuccessful attempt to play semantics throughout the entire course of the proceedings.

Counsel claims that Defendants disingenuously mischaracterized Plaintiff's testimony because Plaintiff never claimed that "a bullet was discharged from the firearm, went sideways, exited the left side of the firearm, and struck his left hand."[26] Brief in Opposition to Sanctions (Doc. No. 62 at 5). He asserts that Defendants attempted to "warp Plaintiffs' theory to be that only a bullet could have caused the Plaintiff's injuries." (Doc. No. 62 at 8). The Court agrees with Counsel's statement that "deceit is unbecoming in advocacy." Sur-Reply Brief (Doc. No. 66 at 5). However, the Court finds that it is *Counsel*, and not Defendants, who has persistently attempted to mischaracterize the evidence and cloak the reality of his client's story. Although

---

[26] The fact that Counsel takes such issue with Defendants' "theory" that it was a bullet that discharged from the side of a gun and went through his client's hand only demonstrates Counsel's tacit acknowledgement of the absurdity of that claim.

Counsel may be correct in his assertion that Plaintiff never uttered the EXACT statement that "a bullet was discharged from the firearm, went sideways, exited the left side of the firearm, and struck my hand," the only logical conclusion to be drawn from his testimony is exactly that.

The Court is troubled by Counsel's *continuous and baseless* assertion that Plaintiff was injured by *shrapnel*, in light of the lack of evidence which exists supports it. At no point throughout these proceedings has Counsel cited to any evidence other than his client's own self-serving, speculative assertion that shrapnel could have caused his injuries because he never saw what went through his hand. See (Doc. No. 62 at 5- 9). Counsel maintains this position in the face of contrary objective medical evidence as well as his client's own testimony that he had an entrance and exit wound and that no gun fragments of any kind were found in his hand upon admission to the hospital.[27] The Court is dumbfounded by Counsel's argument that "Plaintiffs position [that shrapnel could have went through his hand] is *entirely supported by logic* since, as Defendants are aware, a human being cannot see a bullet midflight, and likewise, cannot see shrapnel traveling at the speed of a bullet." Sur-Reply Brief (Doc. No. 66 at 6) (emphasis added). Of course, Counsel is correct in his assertion that no human being could not have seen

---

[27] The fact that Counsel is maintaining this position in his Brief in Opposition to Sanctions is even more disconcerting in light of the admissions and denials made in Plaintiffs' Response to Defendants' Request for Admissions. For example, Plaintiff admitted in "Request No. 4" that the "projectile discharged down and out of the area of the subject pistol above the trigger," could not admit or deny that the projectile that caused his injuries was a bullet because he "was unable to observe the exact projectile as it was traveling at too great a velocity in "Request No. 5," *denied that he pulled the trigger to discharge the eighth round in* "Request No. 7" admitted that his left hand was not in front of the muzzle when the projectile discharged in "Request No. 11," admitted that the projectile that struck his left hand exited the subject pistol through the trigger guard area in "Request No. 15," and admitted that the projectile that struck his hand was not discharged out of the muzzle of the subject pistol in "Request No. 16." The objective medical evidence established that the "projectile" was a "bullet," the testimony establishes that the eighth bullet was not in the firearm after the "explosion," and so it naturally follows that Plaintiff was alleging that a bullet dislodged out of the side of a firearm, without pulling the trigger. Making a logical inference is not tantamount to mischaracterizing evidence.

what allegedly came out of the side of gun and went into Plaintiff's hand; this is why the Court looks to the competent, objective medical evidence of record to establish the nature of the injury.[28]

Moreover, the fact that Counsel is *still* pursuing the shrapnel theory is made more all the more egregious by the posture of this case, as discovery has long been over, and Counsel has garnered no more support for the proposition that his client was injured by shrapnel than he had when he filed the Complaint.  See Fed.R.Civ.P. 11, Advisory Committee Notes to 1993 Amendment ("if evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the *party has a duty under the rule not to persist with that contention.*").  In light of the fact that Counsel reviewed the medical records before he filed suit and the fact that discovery would not have changed the nature of Plaintiff's injury or provided access to necessary materials, the Court finds it negligent for Counsel to have placed such heavy, if not blind reliance on his client's characterization of his injury.  If Counsel wanted to pursue the shrapnel theory then the onus was on him, *and not Defendants*, to seek out the requisite evidence and depose the medical professionals who treated Plaintiff to establish an objective and reasonable basis upon which he could rely in making that argument.

Throughout the course of this litigation, the red flags surrounding the veracity of Plaintiff's account of the incident and the utter lack of evidence to support it only grew in number and Counsel chose to ignore them, seemingly in the hopes that he could negotiate a

---

[28] Counsel appears to have understood this proposition because he argued in his Sur-Reply Brief that "[i]t is not within the province of a lay person to determine whether a projectile which damages human bone and tissue is a bullet, another part of the cartridge, or a piece of the pistol itself." Sur-Reply Brief in Opposition to Motion for Sanction (Doc. No. 66).  The Court cannot begin to reconcile this statement with the fact that Counsel has based his "shrapnel theory" entirely on his client's speculative lay testimony and not the objective medical evidence.

quick settlement.[29]   Indeed, the timeline establishes that Counsel was warned several times by

Defendants that he was advancing a claim without evidentiary support.[30]   Defendants *correctly*

explained to Counsel in one of its letters that he would not find support for his contentions

through any "further investigation or discovery" and that moving forward "will needlessly cause

Beemiller, Inc. to incur additional expenses, costs, and attorney's fees to defend this frivolous

lawsuit." (Doc. No. 56-9.).   Six days later, however, Counsel responded by simply stating: "I

have spoken with my client regarding your contentions outlined in that letter. *My client has*

*related to me that he has accurately represented to the best of his knowledge what occurred on*

*the date of the incident in question.*" (Doc. No. 56-10) (emphasis added).[31]

      As stated earlier, Rule 11 imposed an affirmative and <u>continuing</u> duty on Counsel to

ensure that each and every paper he submitted to the Court contained allegations that were made

with reasonable belief, formed after reasonable inquiry, that they were well-grounded in fact. <u>See</u>

<u>Ideal Instruments</u>, 243 F.R.D. at 342 ("The duty of a party to assess the viability of a claim is not

---

[29] See September 9, 2009 letter (Doc. No. 56-8) (Defendants rejected demand of $93,250 in Counsel's August 12, 2009, letter); Counsel's August 5, 2010, letter (Doc. No. 56-14) (producing Roane's report in hopes that it would "facilitate a settlement").

[30] In a strongly-worded letter dated December 10, 2009, Defendants repeated their position in their September 9, 2009, letter, that "there is absolutely no defect in the pistol," that the June 11, 2009 inspection, "clearly and unequivocally demonstrates that the claims plaintiffs have made against Beemiller, Inc. . . . are without any evidentiary support," that it was "clear that the version of the incident that Mr. Ellis has provided Beemiller, Inc. is grossly inconsistent with the physical evidence," and suggested that Counsel "speak with [his] clients immediately to determine what <u>really</u> occurred on the date of the incident." (Doc. No. 56-9 at 1) (emphasis in original). The December 10, 2009, letter was the second time that Defendants notified Counsel in writing that "each and every allegation, contention, and cause of action" in the Complaint "is patently frivolous and without any evidentiary or legal support." (Doc. No. 56-9 at 1); <u>See</u> <u>also</u> (Doc. No. 56-8).

[31] Counsel appeared to believe that his client's self-serving and unsubstantiated recitation of facts took precedence over a detailed inspection conducted by a firearms consultant and was entitled to greater weight.

measured solely at the time that the claim was filed, but is a continuing one."). Counsel, however, filed numerous submissions in violation of this Rule, blindly relied on his client to supply facts that he never was able to find evidentiary support for, mischaracterized evidence, and insisted on pursuing an unsubstantiated claim even after being repeatedly warned that it lacked evidentiary support. The Court finds that this course of conduct was unreasonable and warrants the imposition of sanctions. See Balthazar v. Atlantic City Medical Center, 137 Fed.Appx. 482, 490 (3d Cir. 2005) ("sanctions are proper when, *inter alia*, a party insist[s] upon a position after it is no longer tenable....") (internal quotations omitted); see also Fed.R.Civ.P. 11, Advisory Committee Notes to 1993 Amendment (the rule "emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable" and "a litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit").

## IV.   Conclusion

In light of the above, the Court finds that this case was "a shot in the dark" and unfortunately for Counsel, he not only missed his mark, his gun was not even loaded.[32]  The Court finds that monetary sanctions are warranted against Counsel and his law firm. Therefore, Defendants are hereby directed to submit a fee petition with supporting material to the Court by December 3, 2012. The Court notes that while Defendants have requested all attorney's fees and costs from the outset of the case, the Court will determine the reasonableness of this request after

---

[32] The Court finds absolutely no merit in Counsel's contention that sanctions are warranted against Defendants and therefore his reciprocal request for sanctions is denied. See Sur-Reply Brief to Motion for Sanctions (Doc. No. 66 at 9).

reviewing the fee petition. Counsel's position as to the reasonableness of the amount of Defendants' requested fees/costs is due no later than December 17, 2012.   The Court will then determine the amount of monetary sanctions to be awarded against Counsel and his law firm.


Date: November 19, 2012                          s/Alan N. Bloch
                                                 United States District Judge

ecf:    Counsel of record