IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REGIS ELLIS and BONNIE ELLIS, his wife, | ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) Civil Action No. 09-1414 ) |
| BEEMILLER, INC. and MKS SUPPLY, INC., t/d/b/a HI-POINT FIREARMS, | ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION

BLOCH, District J.

Presently before the Court is the question of what constitutes an appropriate sanction that "suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed.R.Civ.P. 11(c)(4). The Court has given careful thought to the matter and finds that a monetary sanction of $5,000 against Plaintiffs' Counsel ("Counsel") and $15,000 against his firm, made payable to Defendants, is warranted for the reasons that follow.

## I.     Background

On November 19, 2012, after closely examining the record, the Court found that Counsel violated Rule 11 and issued an Order granting Defendants' "Motion for Sanctions Pursuant to Rule 11 and the Court's Inherent Authority." See (Doc. No. 70). For the reasons set forth in its Memorandum Opinion ("Opinion"), the Court found that Counsel filed certain documents

contrary to the rule's requirement that he reasonably investigate the facts of his case[1] and advance arguments he reasonably believed to be well-grounded in fact and with evidentiary support. See (Doc. No. 69). The Court found that the circumstances warranted monetary sanctions and indicated that it would later determine the amount and the reasonableness of Defendants' request for an award of all the attorney's fees and costs they have incurred since the inception of the case. (Id.). The Court ordered Defendants to submit their fee petition with supporting material and provided Counsel with an opportunity to respond to the same. (Id.)

On December 3, 2012, Defendants filed their fee petition and requested an award of $167,758.15, which represents the total amount of fees and expenses they have incurred since prior to the filing of the Complaint. See (Doc. No. 72). Instead of filing a response to the fee petition and despite having twice responded to Defendants' motion for sanctions (See Doc. Nos. 62 & 66), Counsel, through his own attorney, filed a "Motion for Leave to File Answer to Defendants' Motion for Sanctions" on December 6, 2012. (Doc. No. 77). Counsel also filed a "Motion for Reconsideration of Order Granting Rule 11 Sanctions" that same day. (Doc. No. 79). In these motions, Counsel argued that the record was incomplete because at the time he submitted his briefs in opposition to the motion for sanctions, he failed to appreciate that his interests had diverged with his clients' and that it was necessary for him to disclose certain information that he believed may have frustrated his trial strategy in order to avoid sanctions. See (Doc. No. 78-2 at 2). Consequently, Counsel chose not to disclose evidence relating to his investigation of the case notwithstanding the fact that this information allegedly was material to

---

[1] As noted in the Court's prior rulings, Plaintiffs' claim arose on April 13, 2007 when he allegedly was injured after using a Hi-Point C9, 9mm pistol that was manufactured and distributed by Defendants.

this Court's determination and was in his possession and/or available to him at the time he was responding to the motion for sanctions.

On December 18, 2012, Defendants filed their brief in opposition to Counsel's motion for reconsideration and a declaration in support thereof. (Doc. Nos. 87 & 88).  After considering each party's position, the Court agreed that Counsel had failed to show that relief was warranted under any of the grounds outlined in Rule 60(b) of the Federal Rules of Civil Procedure and denied both motions accordingly on December 19, 2012.[2]  (Doc. No. 89).  On December 24, 2012, Defendants filed declarations representing that they had incurred an additional $4,591 in fees for their work in opposing the reconsideration motion, which increased their total attorney's fees and costs to $172,349.15.  See (Doc. Nos. 91 & 91-1).  On January 2, 2013, Counsel filed a "Response to Defendants' Supplemental Fee Petition" objecting to the inclusion of the additional $4,591 in the sanctions award because it "would have a significant chilling effect on participant's rights to redress purported errors made by the Courts and would contravene the spirit of the Rule 11." (Doc. No. 94 at 2).

On December 28, 2012, Counsel filed his response to Defendants' initial fee petition. See (Doc. No. 93).  In his response, Counsel (i) addressed the type and amount of sanctions that should be imposed and (ii) disputed the reasonableness of Defendants' requested hourly rates in the prevailing market.[3]  (Id. at 2).  The Court agreed that Defendants had failed to submit

---

[2] In their opposition brief, Defendants requested that the Court include in the sanctions award the fees they incurred in opposing Counsel's motion for reconsideration. (See Doc. No. 87 at 25). In light of this request, the Court's December 19, 2012, Order directed Defendants to submit a supplemental petition setting forth those additional fees and costs. (Doc. No. 89).  The propriety of including these fees in the award will be discussed *infra*.

[3] Specifically, Counsel argued that "New York counsel [] failed to submit prima facie evidence that Christopher Renzulli's hourly partner rate of $295.00/hr and John Tartaglia, III's hourly

evidence sufficient to prove the reasonableness of their hourly rates in the local market and ordered them to supplement the record accordingly on January 22, 2013. (Doc. No. 95). On February 6, 2013, Defendants filed declarations setting forth evidence in support of their requested billing rates. (Doc. Nos. 97 & 99).

## II.    **Determining the Type and Amount of Sanctions**

In their submissions, Defendants urge this Court to award them all of the attorney's fees and costs that have been incurred since they were apprised of the claim in October of 2007, an amount totaling $172,349.15.   Defendants contend that they provided Counsel with a number of informal warnings that he was pursuing an unsupported claim and his pursuit of a "baseless" case "needlessly forced [them] and their insurer to incur over $100,000 in fees and expenses." Declaration of John A. Tartaglia (Doc. No. 96 at 12).   They argue that this Court's finding regarding Counsel's unreasonable pre-filing investigation justifies the calculation of fees from the outset of the case and they object to Counsel's position that November 17, 2011, constitutes the earliest starting point for the fee calculation.

Counsel vehemently opposes Defendants' request to treat Rule 11 as a general fee-shifting device and argues that no further sanctions are necessary since this is his first violation and he already has suffered a public reprimand because the Court's Opinion was picked up for publication. See (Doc. No. 93 at 5-6). In the alternative, Counsel contends that a non-monetary sanction or a small monetary penalty to be paid into court constitutes the minimum sanction necessary to sufficiently deter similar future conduct since the Court did not find "a Rule 11(b)(1) violation AND Plaintiff's counsel's violation is not one that is likely to be repeated." (Id. at 4). Finally, Counsel argues that if the Court decides that an award of attorney's fees and

---

associate rate of $225/hr in 2011 and $240/hr in 2012 are reasonable product liability insurance defense rates in Pittsburgh, Pennsylvania." (Doc. No. 93 at 2).

costs is warranted, then the calculation of fees and costs should commence no earlier than

November 17, 2011, the date that Counsel filed the Amended Pretrial Statement[4] and the date

that Defendants formally served notice of their intention to seek sanctions by serving him with a

copy of the sanctions motion.

The Court has given great consideration to the arguments raised by each party, especially

Counsel's representation that he sufficiently has been deterred from engaging in similar conduct

since this is his first violation and he already has suffered embarrassment due to the publication

of the Court's Opinion. The Court disagrees, however, that a nonmonetary sanction or small fine

suffices to address the nature of the violation and the circumstances surrounding it. Although it

is true that Rule 11 sanctions are meant to deter and not compensate, this principle must be

tempered with another guiding principle that "effective deterrence sometimes requires

compensating the victim for attorney fees arising from" the violation. Rentz v. Dynasty Apparel

Industries, Inc., 556 F.3d 389, 400 (6th Cir. 2009); see also Advisory Committee Notes to 1993

Amendment to Rule 11 ("[U]nder unusual circumstances . . . deterrence may be ineffective

unless the sanction not only requires the person violating the rule to make a monetary payment,

but also directs that some or all of this payment be made to those injured by the rule."). The

Court thus finds that the circumstances underlying the triggering documents warrant an award of

---

[4] The Court previously found that the Amended Pretrial Statement (Doc. No. 47) was a triggering document filed in violation of Rule 11 because it (i) contained the shrapnel allegation and (ii) dropped Plaintiffs' experts but retained their theory of an out-of-battery firing despite the fact that, at the time the document was filed, the deposition testimony of Plaintiff and Lester Roane ("Roane") had conclusively established that the gun could not have fired out-of-battery under the facts attested to by Plaintiff and therefore could not have been the cause of any alleged gun explosion. See (Doc. No. 69 at 28). Counsel represents that notwithstanding the reference to the specific defect in the document, he intended to rely on the malfunction theory at trial. See (Doc. No. 93 at 5).

attorney's fees for effective deterrence, not just for Counsel, but for those similarly situated who may engage in comparable conduct. See Fed.R.Civ.P. 11(c)(4).

### A. Nature of Sanctionable Conduct

Counsel characterizes the nature of his actions as simply being that of an attorney who (1) justifiably relied on his client and expert until they testified contrary to what they had told him and (2) proceeded with the case based on his reasonable but apparently mistaken belief that he could rely on the product malfunction theory. See (Doc. No. 93 at 5). Counsel's errors are more troubling than his characterization suggests and his conduct can be described more accurately as that of an attorney who ignored red flags surrounding the veracity and plausibility of his client's story, lodged allegations without having reasonable belief that they were well-grounded in fact and with evidentiary support, and persisted with a claim that he was unable to obtain evidentiary support for, despite having more than enough time and opportunity.[5]

Since the inception of the case, there have been a number of materially inconsistent and contradictory versions of what transpired on August 13, 2007:

(1) **August 13, 2007 Police Incident Report**: "**Ellis related** that he shot multiple shots and **when he was done he put the safety on**. When Ellis started to **transfer the gun from his right hand to his left**, the gun went off." (Doc. No. 61-6) (emphasis added).[6]

_____

[5] See Fed.R.Civ.P. 11, Advisory Committee Notes to 1993 Amendment ("[I]f evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under the rule not to persist with that contention.").

[6] In ¶ 23 of his affidavit, Counsel asserts that "throughout the course of this case" he "continued to investigate the claim made by Mr. Ellis and continued to _uncover evidence that substantiated his recollection of the operative facts of this lawsuit including the police report for this incident_." See (Doc. No. 78-2 at 4) (emphasis added). The Court fails to see how the incident report does anything but directly contradict Plaintiff's "recollection of the operative facts" since it provides a _completely_ different account of the incident. The incident report provides that Plaintiff was done shooting the gun, put the safety on, and was in the middle of transferring the gun from one hand to the other at the time the gun "exploded." That factual account is at odds with the one Plaintiff

(2) **Witness Statement of David Williams** ("Williams"): "After I was done [firing the first clip] I gave the gun to Regis to use. He **fired his clip off, told me he put it on safe** [sic] and was **about to hand it back to me** when it went off in hand. Note-his hand was griping [sic] the hadle [sic] --**Finger nowhere near trigger** [sic]." (Doc. No. 56-5) (emphasis added).

(3) **Plaintiff's July 27, 2011 Deposition**: ". . . I fired it seven times. And the eighth time I noticed that the breach was open. I went to pull - - I mean, I looked at it and went to pull it back. . . . I believe **I said to [Dave]** at the same time that I - - when I was reaching for the slide, **I said, I think it jammed**. And **I went to reach for the slide, and that's whenever the gun went off**. (Doc. No. 61-2 at 75) (emphasis added). After firing the seventh round, "I lowered [the gun] and **I said, Dave, I think it jammed** . . . . I pointed the gun down to the ground and I was reaching over - - I mean, at this time I left - - **I [took] my left hand off of the bottom [of the gun] and I pointed. I said, I think it's jammed. And [Dave] was mentioning like taking a step towards me**, and I went to just eject the shell, to pull the slide back to . . . pop that shell . . . out of the breach, or whatever." (Id. at 82) (emphasis added).

"Q: Did you pull the trigger after the seventh? **A: No**; Q: After you shot the seventh, you did not pull the trigger? **A: No, I did not - - no. No**; Q: At all? **A: No**; Q: Are you sure? **A: Positive**; Q: Absolutely positive you didn't pull the trigger to try to discharge that eighth round? **A: Yeah, no, I didn't."** (Doc. No. 61-2 at 83) (emphasis added).

**"Q: Do you remember then telling me** [during a telephone interview two years ago] **that you tried to pull the trigger to discharge the eighth round**, but the trigger didn't go forward at all? **A: No, I don't remember that**; Q: You don't remember? A: No." (Doc. No. 61-2 at 127-28) (emphasis added).

"I would say [that the slide was open] a half inch, three quarters of an inch. . . . [After I saw that the slide was open] I lowered [the gun] to the ground,

testified to at his deposition (*i.e.* Plaintiff only shot seven rounds, happened to notice that the slide was open 0.5 to 0.75 inches before firing the eighth shot, commented to Williams that he believed the gun was jammed, and was in the middle of reaching for the slide in an attempt to clear the alleged jam when the eighth round dislodged out of the trigger housing, without the trigger being pulled). The Court notes that this latter set of facts is not substantiated by any other piece of evidence, not even Williams' deposition testimony. If anything, Counsel knew after Williams' deposition that his client had testified untruthfully about a number of material facts, one of the most salient being the investigating police officer allegedly commenting to Williams that "he [had] never seen a gun do that before" and that "someone's got a lawsuit" with the gun. See (Doc. No. 61-2 at 75). Williams also denied that Plaintiff made any comments about the gun "jamming" immediately before the incident occurred.

and . . . put it in one hand. I lowered it to the ground. **I take my finger off the trigger**, lower it to the ground, take the left hand off. And I mention to [Williams], **I say to him that I think it jammed**. And now my hands are apart. And **as I go to reach for [the slide], that's whenever it - - that's when the malfunction happened.**" (Doc. No. 61-2 at 87) (emphasis added).

"Q: [C]ould you point to me on the . . . **part of the gun where this round came out** of? A: It would have come down . . . and [to the left] **out of the trigger housing** . . . . If my finger would have been on the trigger, it would have took [sic] the tip of my finger off." (Doc. No. 61-2 at 97) (emphasis added). "Q: Did you **put the safety on** at any point, at any time? **A: No. No. I turned it off**; Q: [D]id you **ever go to hand Dave the gun** after he first gave it to you? **A: No. No, I did not**." (Id. at 101-02) (emphasis added).

"Q: Do you remember the trooper's name at all? **A: No. Like I said, I never spoke with [the police officer]**." (Doc. No. 61-2 at 120); Q: You don't have any memory of [the police officer interviewing you]? A: No, not at all. (Id. at 122); Plaintiff: "The only thing I remember of David talking to the police officer is . . . **[Dave] said that the police officer said, someone's got a lawsuit going with this gun.** Q: Dave told you that the police officer said that? **A: Correct. [Dave] said [the police officer] said he never seen a gun do that before. He said, someone's got a lawsuit.**" (Id. at 125).

"Q: **So Dave picks [the gun] up from the ground**? **A: Right** . . . As soon as he picked it up off the ground . . . **he looked at it on the ground**, and you could see that the gun was deformed." (Doc. No. 61-2 at 102) (emphasis added).

(4) **Williams' July 28, 2011 Deposition**: "[Regis] **might have been in the process of handing me the gun back**" at the time of the accident. (Doc. No. 61-1 at 80) (emphasis added); "He might have mentioned that [he had the safety on when the accident happened]. I don't know . . . If he was handing me the gun back, he would say the safety is on." (Id. at 79).

Q: "Did Regis ever attempt to hand you this gun before this round went off or this blow up occurred? A: Well, he was probably being in the process **because he was done firing it**. That would be the logical conclusion to hand it back to me . . . ." (Doc. No. 61-1 at 132) (emphasis added).

"I just remember seeing the gun flying out of his hand. . . . I looked down and could see the **pistol in the creek**. . . . It was in **a couple inches of water**. . . . Q: So [Plaintiff] **did not say anything to you before** this happened? **A: No**, I don't see where he would have had time to say anything. (Doc. No. 61-1 at 82) (emphasis added).

"[The **police officer] didn't say nothing**. He wouldn't make a comment. I says what do you think happened here because I asked him. He says, [] I don't

know. **He says I can't comment on that gun**, you know, so . . . . (Doc. No. 61-1 at 93)(emphasis added); Q: What else did the state trooper say when you were showing him the gun? A: He **said virtually nothing to me**. Q: **Did he tell you that somebody has a big lawsuit? A: No, he didn't say that. . . . he wasn't talking much at all**. (Id. at 97) (emphasis added).

"Q: So everything in [the February 15, 2008, Witness Statement] [i]s truthful and accurate? A: "I would agree with [the Witness Statement], yes." (Doc. No. 61-1 at 118).

(5) **Affidavit of Counsel**: "At the [April 18, 2007 meeting with Mr. Sero], **Mr. Ellis stated** that he ha[d] shot the subject firearm seven times and the **accident occurred as he pulled the trigger of the gun to fire the eighth shot**." (Doc. No. 78-2 at 2) (emphasis added).

In pointing out these materially diverging accounts, the Court is not suggesting that Counsel was required to dismiss the case based on the mere fact that there were contradictory versions of what happened on the day of the incident. The Court's purpose in taking note of them is to highlight the circumstances underlying the triggering documents and Counsel's failure to meaningfully convey the salient facts to his expert, Lester Roane,[7] in order to ensure that his opinion had a proper "fit" to the facts of the case.

While the record is unclear as to what specific set of facts Counsel conveyed to Roane at the time of his retention, the record indicates that Roane's opinion in his July 9, 2010 expert report was based on his understanding that the trigger was pulled[8] and that the bullet exited out of the muzzle. See Expert Report of Lester Roane (Doc. No. 39-4). Although Roane's report does not contain a factual recitation demonstrating his knowledge of the material facts, he

---

[7] Lester Roane was Plaintiff's firearms expert who opined in his July 9, 2010 expert report that the damage to the gun was caused by an out-of-battery firing.

[8] The Court also bases this conclusion on Counsel's representation in his affidavit that Plaintiff originally told him he pulled the trigger and on the evidence in the record that Plaintiff did not change his story about pulling the trigger until his deposition. See Roane's Deposition (Doc. No. 56-3 at 15).

confirmed at his deposition that he had to pull the trigger to achieve an out-of-battery firing and that, other than the muzzle, he could not see anywhere else from where the bullet could have exited.[9] See (Doc. No. 51-14 at 20; Doc. No. 56-3 at 4). Roane also confirmed that, although he was asked to determine the cause of the damage to the pistol, he (i) was never asked to determine the location from which the bullet dislodged and was not aware that it allegedly did not come out of the muzzle, and (ii) was never asked to recreate the damage to the gun in order to confirm that an out-of-battery discharge could account for the damage to the gun and cause a round of ammunition to exit the gun through the trigger housing. See (Doc. No. 56-3 at 5-6, 10-12).

The Court is cognizant that the allegations about the gun exploding in the absence of a trigger pull and with the slide being open 0.5 to 0.75 inches[10] did not come to light until Plaintiff's July 27, 2011 deposition. The record, however, demonstrates that Counsel failed to properly communicate material facts of the case to Roane well before Plaintiff changed his story at his deposition. Indeed, the record shows that Counsel knew since early 2008 that, at the very least, the allegation involved a bullet discharging out of a location that was not the muzzle. Williams' February 15, 2008 Witness Statement (Doc. No. 56-5) explicitly stated that the round of ammunition discharged from the trigger housing,[11] and a correspondence dated January 23, 2008 (Doc. No. 88-4) confirms Counsel's understanding that his client sustained an injury after "the gun misfired" and "a *bullet* went through his hand, breaking his thumb . . . ." (Doc. No. 88-4

---

[9] Specifically, Roane agreed that the bullet "is not going to come out of the side of the gun," or "the trigger guard of the gun." (Doc. No. 56-3 at 4).

[10] Roane's July 9, 2010 expert report stated that the gun would fire when it was only 0.070 inches out of battery. See (Doc. No. 39-4).

[11] Counsel's knowledge that the bullet allegedly did not exit from the muzzle is also demonstrated by ¶ 11 of the Complaint which alleges that injury resulted after "shrapnel, and/or a bullet and/or cartridge *came through the slide and frame area of the firearm.*" (Doc. No. 1-3) (emphasis added).

at 3) (emphasis added). According to Counsel, he suspected that the incident was caused by an out-of-battery firing since April 18, 2007,[12] well before he ever retained Roane. Thus, given Counsel's pre-filing knowledge that the allegation involved a bullet dislodging out of a location that was not the muzzle, coupled with the implausible nature of this allegation and his suspicion as to the possible cause, Counsel should have recognized the need to (i) inform his expert at the time of his engagement that the round of ammunition allegedly did not exit out of the muzzle and ask him to determine whether the objective physical evidence supported that allegation, and (ii) ensure that his expert performed testing to recreate the damage in order to provide evidentiary support for his suspicion that the gun damage[13] was the result of an out-of-battery firing which caused a bullet to dislodge from a location other than the muzzle - - specifically, the trigger housing of the gun. Counsel's failure to do so precluded his expert from conducting a meaningful inspection of the gun and forming an opinion that properly fits the facts of the case. This, in turn, prevented the inapplicability of the out-of-battery firing theory from being discovered at a much earlier time, as Roane confirmed at his deposition that (i) an out of battery firing would not cause a bullet to dislodge from anywhere other than the muzzle, and (ii) based on the physical damage, the bullet did exit from the muzzle. See (Doc. No. 56-3 at 4-5).

Counsel's failure to provide his expert with the salient facts of the case is most illustrated by the circumstances immediately preceding the submission of the Pretrial Statement, which was filed after Plaintiff's deposition without real confirmation that the allegations contained therein

---

[12] Counsel alleges that on that day, he met with his client, another colleague from the firm, and a firearms consultant named Samuel Sero ("Sero") examined the gun and opined that the incident was caused by an out-of-battery firing. See Counsel's Affidavit (Doc. No. 78-2 at 2); see also Sero's Affidavit (Doc. No. 78-1). The Court will discuss the April 18, 2007 meeting infra.

[13] After all, Roane's sole duty was to determine the cause of the damage to the pistol. See (Doc. No. 56-3 at 5-6).

were well-grounded in fact and with evidentiary support. After Plaintiff's deposition, it became

clear that an out-of-battery firing was not the cause of the incident because Plaintiff's testimony

as to the circumstances surrounding the "gun explosion" effectively ruled it out as Plaintiff swore

the incident occurred without him pulling the trigger, and with the slide open so wide that the

gun was incapable of discharging at all.[14]  Instead of specifically pointing out to Roane the

damaging portions of his client's testimony and discussing its effect on the viability of the out-

of-battery firing theory (and by extension, the entire case), there is no evidence that Counsel did

anything more than send him a copy of the nearly 200-page deposition in an August 16, 2011,

---

[14] Defendants' firearms expert, Dr. Robert Levine, explained in his report that "Hi-Point  pistols cannot discharge a round of ammunition when the slide is approximately 0.10 inches or more rearward because at this point the engagement between the trigger bar and sear cam is broken." (Doc. No. 50-7 at 5).  He further stated that his "testing of another exemplar Hi-Point C9 pistol confirms that even if a cartridge was discharged OOB, it could only do so if the trigger was pulled fully rearward and would not produce damage to the slide and frame that was present in the subject pistol, or cause a bullet to be expelled downward and sideways through the "trigger housing" as represented by Mr. Ellis in this case." (Id. at 6).  Roane confirmed at his deposition that that the gun would not discharge without the trigger being pulled, that it *would not fire when it was more than 0.070 inches open*, and that he did not see anywhere else that the bullet could have exited except for the muzzle.  See (Doc. No. 56-3 at 4, 12); (Doc. No. 51-14 at 20).

correspondence[15] that simultaneously disclosed 19 other categories of documents. See (Doc. No. 62-5).[16]

Counsel argues that despite his knowledge that his client testified untruthfully at his deposition, he "believed that it was reasonable to continue with [his] representation of Mr. Ellis following his Deposition as Mr. Roane was provided with [all the salient materials including Plaintiff's Deposition Transcript] wherein he stated that he did not pull the trigger of the subject firearm, and *Mr. Roane stated that these materials did not cause him to change his opinion.*" Affidavit of Counsel (Doc. No. 93-1 at 8) (emphasis added). Contrary to Counsel's contention that he properly investigated the matter by sending the August 16, 2011 correspondence, his reliance on Roane's response to that correspondence in filing the Pretrial Statement was not reasonable under the circumstances as Roane's "supplemental opinion" was a four-line email that made clear he merely "speed-read" through the large volume of materials. See (Doc. No. 62-6). Roane's inattention to Plaintiff's deposition transcript is evidenced by the fact that his

---

[15] The August 16, 2011 correspondence also apprised Roane for the first time of Defendants' position (that Counsel was informed of on October 21, 2010) that the damage to the gun was caused by another firearm. See (Doc. No. 62-5). Counsel asked Roane to "review the attached documents to the extent you deem necessary and supplement your original opinion in this case by stating that you have reviewed these documents and then rendering an opinion regarding [Defendants' position]." (Id. at 3). Counsel did not ask Roane to conduct any testing to test the viability of the theory, notwithstanding (i) the uncanny resemblance between the pictures of the incident and test pistols, (2) the fact that his client had just changed his story and testified untruthfully at his deposition, and (3) the fact that Counsel was aware after Williams' July 28, 2011 deposition that his client falsely attributed a litigious statement to the investigating police officer.

[16] For the sake of clarity, the Court notes that its decision to impose sanctions is not related to Roane's testimony that he never received any of the materials that were sent in the August 16, 2011 correspondence (Doc. No. 62-5).

email did not refer to Plaintiff's deposition or explain why Plaintiff's fundamental change of story did not affect his opinion as to the cause of the damage to the gun.[17] See (id.).

Counsel's failure to meaningfully communicate the material facts to his expert further is illustrated by Roane's deposition, where he confirmed that Counsel never actually discussed Plaintiff's deposition with him and that Plaintiff's new version of the story did, in fact, change his opinion that the damage to the gun was caused by an out-of-battery firing. (Doc. No. 56-3 at 15) ("We talked about his client's testimony. Or he told me about it. I -- *we didn't discuss it. He just told me about it*.") (emphasis added). Roane's testimony also establishes that he *still* was unaware of the facts and circumstances surrounding Plaintiff's injury at the time of his deposition. See (Doc. No. 50-14 at 5) ("I don't know the facts of the case. I just know what I received, [] the gun, and I was told that someone was injured."); (Doc. No. 56-3 at 15) ("I really don't know anything about the circumstances of the incident"). Thus, the fact that Counsel merely sent him Plaintiff's deposition is meaningless in light of his failure to ensure that Roane read and, most importantly, understood the problems it presented -- especially when those problems substantially affected the viability of a theory that their entire case depended on.

Notwithstanding the fact that the Pretrial Statement was filed without specific confirmation that the out-of-battery theory had continued applicability in light of Plaintiff's deposition testimony, the Court finds that it was Counsel's decision to continue representation after Roane's Deposition that constitutes his most significant misstep because by the end of his

---

[17] Roane's email also failed to discuss Defendants' test pistol pictures and the reasons why they did not affect his opinion. See (Doc. No. 62-6). This is significant because at his deposition, Roane could not tell the difference between the guns and confirmed that he "did nothing to determine whether or not the defense contention is correct, that this damage was caused by something other than an out-of-battery firing." See (Doc. No. 56-3 at 8-9). Thus, although Counsel sent Roane the pictures and told him to review them and supplement his opinion accordingly, reliance on his email was unreasonable because it did not refer to the pictures or Defendants' contention, or explain the basis for why their position did not change his opinion.

deposition, all Counsel was left with was an unsupported allegation based on an impossibility. To be sure, when Defendants asked Roane the relevant questions, Roane confirmed that the gun would not fire if the slide was more than .070 inches open, that the trigger had to be pulled in order for the gun to discharge, that he did not see anywhere else that the bullet could have exited from except for the muzzle, and that the opinion that the damage was caused by an out-of-battery firing was based on speculation since he did not do any testing to recreate the damage. By the time his deposition was over, Roane was in agreement with Defendants' expert that (i) the gun could not have discharged a round of ammunition under the manner attested to, and (ii) the physical evidence showed that the bullet could not have discharged from anywhere other than the muzzle. Counsel has yet to explain how his client's self-serving testimony and the testimony of his childhood friend were capable of proving otherwise.

The end of Roane's deposition marked the end of discovery and Counsel had failed to obtain objective evidentiary support for his defect claim, despite having more than enough time and opportunity. Counsel was left to prove his case with nothing more than an allegation that not only lacked support, but was, by all accounts, physically impossible. The fact that both experts ultimately shared the conclusion that the incident could not have occurred as Plaintiff said it did should have (i) alerted him that he failed to garner evidentiary support for his claim and (ii) reinforced the necessity of expert testimony at trial in order to move his client's claim beyond a mere allegation. However, instead of abiding by his duty[18] under Rule 11 to not persist with the claim, Counsel proceeded with the case and filed the Amended Pretrial Statement.

---

[18] Fed.R.Civ.P. 11, Advisory Committee Notes to 1993 Amendment ( "[I]f evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under the rule not to persist with that contention. [This Rule] *does not require* a formal amendment to pleadings for which evidentiary support is not obtained, but rather calls upon a litigant not thereafter to advocate such claims or defenses.").

Indeed, the filing of the Amended Pretrial Statement was not simply the product of careless drafting, nor was it filed with the reasonable but mistaken and uncommunicated belief that the case could proceed under the product malfunction theory; instead, the document represents a memorialization of Counsel's conscious decision to take to trial a mere allegation which lacked objective evidentiary support and was only corroborated by (1) the self-serving and speculative testimony of his client who he knew had already testified untruthfully at his deposition and would be testifying similarly at trial, and (2) pictures of the incident gun which reflects damage so suspiciously similar to a gun that had been altered that his own firearms expert with over forty years of experience could not distinguish between the two.[19] Indeed, if Plaintiffs' own expert could not discern the difference between a non-defective firearm that had been altered and a firearm that allegedly had "malfunctioned," how was a jury supposed to competently make that distinction?

Counsel, however, claims that his decision to move forward after Roane's deposition[20] was justified based on his understanding of the product malfunction theory. Regardless of whether Counsel believed he was reasonable in proceeding under the malfunction theory after

---

[19] See Roane's Curriculum Vitae (Doc. No. 39-7).

[20] Counsel also asserts in ¶ 50 of his Affidavit that he could not have anticipated that Roane would "change his testimony to state that the accident could not have occurred in the manner set forth in [Plaintiff]'s deposition." (Doc. No. 78-2 at 10). The Court completely disagrees, and finds that Roane's September 16, 2011 email gave Counsel more than sufficient notice that there existed *a great likelihood* that Roane either did not read the deposition or that he failed to catch the key portions which effectively ruled out his out-of-battery firing theory. Furthermore, as noted earlier, Roane's expert report stated that the gun is capable of discharging when the slide is 0.070 inches out-of-battery. See (Doc. No. 39-4 at 1). At the very least, Counsel should have explicitly confirmed the continued applicability of this theory in light of the fact that his client had just testified that the slide was out-of-battery *more than 7 times that many inches* at the time the gun discharged a bullet out of its trigger housing, without the trigger being pulled.

Roane's deposition, the fact remains that he knew the evidence[21] of defect at trial would be based

almost entirely on his client's testimony, which was rife with material inconsistencies and reason

to question his veracity and ulterior motives. After Roane's deposition, it was Counsel who

"found himself in a hole and refused to stop digging,"[22] instead choosing to go to trial with a

claim that he knew would rise or fall based on whether the jury believed his client's unsupported

and ever-changing story.[23]

Based on his submissions, Counsel appears to believe that the Court sanctioned him

based on a mere disagreement of law.  However, it is not that the Court disagreed with the

general proposition[24] that the malfunction theory exists to allow claims of defect to be

---

[21] The Court notes that the exhibits of "prior similar incidents" which Counsel submitted in support of his reconsideration motion were not submitted in connection with his briefs in opposition to the motions for summary judgment and sanctions.  See Exhibits 2A-2D, 2F (Doc. No. 82); see also (Doc. Nos. 61 & 62).

[22] In his sur-reply brief to the motion for sanctions, Counsel asserts that Defendants were the ones who "disregarded the now commonplace advice of Will Rogers: 'When you find yourself in a hole, stop digging.'" (Doc. No. 66 at 8).

[23] The Court notes that, even under the malfunction theory, "the plaintiff cannot depend upon conjecture or guesswork" in establishing his or her claim of defect.  Dansak v. Cameron Coca-Cola Bottling Co., Inc., 703 A.2d 489, 496 (Pa. Super. 1997).

[24] The Court could not locate authority which confirms the inapplicability of the malfunction theory in cases such as this where Plaintiff has been in possession of the allegedly defective product for a number of years and has subjected it to repeated examination.  In this Court's estimation, the Pennsylvania Supreme Court has qualified the malfunction theory's availability and has limited it to situations "where the allegedly defective product has been destroyed or is otherwise unavailable." Barnish, 980 A.2d at 539.  The Court maintains its belief that the malfunction theory has no applicability in this case since the entire reason it exists is to level the playing field for plaintiffs who, through no fault of their own, are no longer in possession of the product.  See Dansak, 703 A.2d at 495.  This is evinced by the discouragement of the theory's use in design defect cases where the entire line of the product is available for examination.  See id. at 496, n.8 ("When a plaintiff seeks to prove that an entire line of products was designed improperly, the plaintiff need not resort to the malfunction theory.  Rather, he or she may prove the defect by presenting expert testimony based on an examination of similar articles to the one that injured the plaintiff.").  Given his possession of and/or access to the firearm for nearly four years, Counsel had ample time and opportunity to uncover the nature of the alleged defect

established through circumstantial evidence and does not require, *as a matter of course*, expert

testimony regarding the nature of the specific defect. See Barnish v. KWI Bld. Co., 980 A.2d

535, 541 (Pa. 2009). To the contrary, it was the applicability of the theory in a case like this and

the *nature* of the circumstantial evidence sought to be relied upon in establishing it that the Court

took issue with.[25] Even if Counsel was not required to prove a specific defect under the

malfunction theory, he still had to demonstrate that it was possible for Plaintiff to have been

injured by a firearm that was capable of discharging a bullet out of its trigger housing, without

the trigger being pulled, and with the slide being open so wide that the gun physically was

incapable of firing.[26]

Contrary to Counsel's assertion, in finding that non-expert evidence would not suffice to

establish the existence of an unspecified defect under the malfunction theory, the Court did not

craft "newly created requirements,"[27] but rather recited Plaintiffs' burden of supporting their

---

through expert evidence, and his inability to garner objective support that aligns with his client's
version of events should not serve as a basis to rely on a theory that, by all indications, is not
intended to apply under these circumstances. However, it being unclear whether reliance on the
theory was barred *as a matter of law*, it was not unreasonable for Counsel to believe that, as a
general matter, the malfunction theory had potential applicability.

[25] The evidence that Plaintiffs sought to go to trial on showed only that an accident happened on
April 13, 2007, and according to Plaintiff and his medical records, the accident was in the form
of "an accidental discharge of a 9-mm handgun" which "caus[ed] a bullet injury to the thenar
area of [Plaintiff's] left hand." (Doc. No. 88-5 at 7).

[26] If Counsel did not demonstrate the plausibility of the gun malfunctioning under these
circumstances, and the jury returned a verdict in Plaintiffs' favor, then the verdict would have
been based entirely on speculation and conjecture since both experts in this case have agreed that
the gun physically could not discharge in the manner Plaintiff attested to.

[27] In his brief in support of his motion for reconsideration, Counsel argues that the Court
"essentially" has "held that in order to pursue a malfunction theory, the Plaintiff had to establish
how the incident happened such that a jury could find that the gun could fire with the slide open,
that the bullet could exit out of the left side of the gun and that it could fire without the trigger
being pulled." (Doc. No. 80 at 6). He argued that the Court "conclude[ed] that the Plaintiff
could not meet these three newly created requirements and then decid[ed] that the failure to meet

defect claim with competent and objective evidence capable of demonstrating the occurrence of

the malfunction under the circumstances that Plaintiff testified to. The Court's finding that

expert evidence was required to prevent the verdict from being based on speculation is not

tantamount to a finding that proof of a *specific* defect was required under the malfunction theory.

Proof of the former only is to ensure that Plaintiffs "present evidence from which a jury can infer

the elements of a strict liability action, *beyond mere speculation.*" Barnish, 980 A.2d at 539

(emphasis added). Indeed, even the Pennsylvania Supreme Court[28] anticipates the use of expert

testimony as to the possible causes of the incident to help strengthen the inference that a

malfunction occurred. See id. at 542-43. Thus, regardless of whether Counsel believed it

reasonable to proceed after Roane's deposition based on his understanding of the malfunction

theory, he was unreasonable in his belief that he could establish liability under this theory by

the requirements warranted sanctions . . . ." (Id.). Counsel's argument is misplaced as these
were not "requirements" that one had to establish in order to make out a prima facie case under
the malfunction theory but rather, common-sense requirements that were necessary to ensure that
the discharge of the firearm in the manner alleged was physically possible in order to avoid a
verdict based solely on speculative lay testimony. Furthermore, the Court believes it sufficiently
has explained that its decision to impose sanctions is not related to, and is in no way the result of,
Counsel's mere inability to survive summary judgment. The failure to create a genuine issue of
material fact, in and of itself, certainly is not the type of conduct that warrants sanctions. The
failure to conduct a reasonable investigation into the facts, the failure to lodge allegations with
reasonable belief that they are well-grounded in fact and with evidentiary support, and the
insistence on going to trial with nothing more than an unsupported allegation is the type of
conduct that does.

[28] Furthermore, and contrary to the assertion that the Court took an "unduly restrictive view" of
the theory by requiring them to "refute" Defendants' evidence that the damage to the gun was
caused by another firearm, the Barnish Court explicitly states that under the malfunction theory,
"it is necessary to **negate** other causes of the failure of the product for which the defendant
would not be responsible, in order to make it reasonable to infer that a dangerous condition
existed at the time the defendant had control." Barnish, 980 A.2d at 542, n.5 (emphasis added).
Given the nature of the allegation (i.e. injury from a firearm), and the near identical damage to
Defendants' test pistol, Plaintiffs did not negate the equally reasonable explanation that the
damage to the pistol was caused, not by a bullet that discharged sideways out of the trigger-
housing without the trigger being pulled, but by a force from outside the pistol – namely, another
firearm.

allowing his client to provide testimony that he either knew or strongly suspected would be untruthful and that made it impossible for the gun to have "malfunctioned" the way his client said it did. Against this backdrop, the Court finds that this case does warrant an award of attorney's fees for "effective deterrence."

B. Starting Point for Fee Calculation

Now that the Court has determined that the appropriate type of monetary sanctions is an award of attorney's fees and costs, the Court must determine the amount of the award. In doing so, the Court notes that an award of attorney's fee and costs does not necessarily mean actual fees and costs, but those that are reasonable under the circumstances. See e.g., Gaiardo v. Ethyl Corp., 835 F.2d 479, 483 (3d Cir. 1987) ("The Rule authorizes "reasonable" fees, based on what is fair and reasonable in the particular circumstances-not necessarily actual fees."); Napier v. Thirty or More Unidentified Federal Agents, Employees or Officers, 855 F.2d 1080, 1091-92 (3d Cir. 1988) (noting that the "courts retain discretion to tailor the sanction to the violation."). Thus the Court's inquiry in this respect is two-fold: it first must determine the appropriate starting point for which the calculation of fees and costs may begin before it engages in the lodestar calculation and an analysis of what constitutes a reasonable award under the circumstances.

Despite Defendants' urging for an award of all the fees and costs they have incurred since the outset of this case, Rule 11 and the case law interpreting it make clear that an award of attorney's fees must include only those fees and expenses for services "directly and unavoidably caused by the violation of the certification requirement." Rule 11, Advisory Committee Rules to 1993 Amendment; see also Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 406 (1990) ("Rule 11 is more sensibly understood as permitting an award only of those expenses directly caused by the filing, logically those at the trial level."). Indeed, "Rule 11 sanctions should not be viewed as

20

a general fee shifting device." Gaiardo, 835 F.2d at 483. Since the goal of Rule 11 is focused on the "correction of litigation abuse," including only those fees and expenses resulting directly from the improper filing is in accordance with the "American Rule" which "require[es] parties to shoulder their own legal expenses." Id. (citing Alyeska Pipeline Serv. Co. v. Wilderness Society, 421 U.S. 240 (1975). Thus, it being clear that Defendants are not entitled to an award of attorney's fees in the amount of $172,349.15, the Court must determine the appropriate date to commence the fee calculation.

Though the Court found that Counsel's pre-filing investigation was unreasonable, it explained that it could not treat the Complaint as a triggering document since it originally was filed in state court. See (Doc. No. 69 at 14, n.12). The first triggering document filed subsequent to the Complaint was the Pretrial Statement which was filed on September 19, 2011.[29] Counsel argues, however, that it would be inappropriate to make that date the starting point because the "Court did not opine that 'dismissal was appropriate' until after Roane's deposition on October 17, 2011." (Doc. No. 93 at 9). As noted above, Counsel contends that the earliest starting point should be November 17, 2011, the date he filed the Amended Pretrial Statement and the date that Defendants formally served him with a copy of their sanctions

---

[29] The Court found that this document was submitted in violation of Rule 11 because (1) it contained the "shrapnel" allegation, (2) it alleged that an out-of-battery firing was the cause of the incident even though it was filed after Plaintiff's July 27, 2011, deposition where he testified to facts (materially different from what he had previously told Counsel) which effectively ruled out an out-of-battery firing, and (3) it could not have been filed with the reasonable belief that it was well-grounded in fact and with evidentiary support because Counsel failed to (i) specifically discuss the damaging portions of Plaintiff's testimony with Roane and (ii) investigate and refute Defendants' theory that the damage to the gun was caused by an outside force (i.e. another firearm). See Sanctions Opinion (Doc. No. 69 at 23-27). The Court also found that it was unreasonable for Counsel to rely on Roane's "supplemental opinion" which was a short email that stated "I have speed-read through the material you sent me a couple of weeks ago. There is nothing in there that would cause me to change my opinion about the cause of the incident." (Doc. No. 62-6).

motion. He argues that if he had dismissed the lawsuit before the expiration of the 21-day safe

harbor, then this Court could not have ordered sanctions. See (Doc. No. 93 at 9). Defendants

object to November 17, 2011, as being the earliest starting date for the fee calculation and argue,

inter alia, that Counsel "should not be able to prospectively limit the amount of monetary

sanctions he is responsible for based on the opportunity he had, but failed to avail himself of, to

dismiss this case after Defendants motion was served on him in November of 2011." (Doc. No.

96 at 13).

After considering the circumstances, the Court agrees with Counsel that the most

equitable and appropriate starting point for the calculation of fees is November 17, 2011.[30]

Although the Court found that the September 19, 2011 Pretrial Statement was a triggering

document in light of Counsel's failure to specifically discuss and bring to Roane's attention the

damaging portions of Plaintiff's deposition testimony and Defendants' theory that the damage to

the incident pistol was caused by another firearm, Counsel's decision to move forward, while

unreasonable, was not *so* baseless as to warrant the calculation of fees from September 19, 2011.

The fact remains that Counsel did send Plaintiff's deposition transcript as well as the

Defendants' test pistol pictures, and, he did receive an email from Roane which stated that

"nothing in there [] would cause me to change my opinion about the cause of the incident"

before he filed the Pretrial Statement. See (Doc. Nos. 62-5 & 62-6). While Counsel should have

---

[30] Though Defendants previously had provided Counsel with informal warnings regarding their
intent to seek sanctions on the basis that Counsel was pursuing a baseless and frivolous lawsuit,
the Court nonetheless finds that November 17, 2011 constitutes the date that they properly
served Counsel with formal notice under Rule 11 by serving him with a copy of the actual
sanctions motion they intended to file with the Court. See Gary v. Braddock Cemetery, 517 F.3d
195, 199 n.2 (3d Cir. 2008) ("Fed.R.Civ.P. 11(c)(1) requires a litigant to give advance notice of
the intent to move for sanctions by properly serving the opposing party with a copy of the motion
prior to filing with the court.").

"stopped, looked, and listened" when he received Roane's email, he did at least attempt to provide his expert with the salient materials. This factor, in combination with the fact that it was not until after Roane's October 17, 2011, deposition that the case truly fell apart, is what precludes this Court from finding that September 19, 2011, constitutes the appropriate starting point for fees.[31]

Indeed, November 17, 2011, is the most appropriate starting point because despite the fact that both experts agreed at the end of discovery that the incident could not have happened the way Plaintiff alleged, and despite the fact that he failed to obtain evidentiary support for his claim, Counsel filed the Amended Pretrial Statement instead of dismissing the case, indicating his intent to persist with a claim he knew had no objective evidentiary support for. Counsel did not abide by his duty under Rule 11 to abandon the unsupported allegation and Defendants are entitled to an award of the reasonable fees and costs they incurred from that date as a result.

## III.   Lodestar Calculation

Having determined that November 17, 2011, is the most appropriate date to commence the calculation of fees, the Court now turns to the lodestar calculation. The lodestar calculation is the first step in the determination of attorney's fees and constitutes the "product of the number of hours reasonably expended in responding to the frivolous paper times an hourly fee based on the prevailing market rate." Doering v. Union County Bd. of Chosen Freeholders, 857 F.2d 191, 195 (3d Cir. 1988). "The party seeking fees bears the burden of producing sufficient evidence of

---

[31] October 17, 2011 (the day of Roane's deposition), also would be an inappropriate starting point for the calculation of fees since it is not tied to a specific improper filing. See Waltz v. County of Lycoming, 974 F.2d 387, 390 (3d Cir. 1992) ("[A]s the Supreme Court has emphasized, Rule 11 permits an award only of those expenses directly caused by the improper filing."). Since the Court is unwilling to commence the fee calculation from the Pretrial Statement date of September 19, 2011, November 17, 2011, represents the date of the second improper filing (Amended Pretrial Statement) and Defendants are entitled to the reasonable fees and costs incurred as a result of that filing.

what constitutes a reasonable market rate for the essential character and complexity of the legal services rendered in order to make out a prima facie case." <u>Lanni v. N.J.</u>, 259 F.3d 146, 149 (3d Cir. 2001) (citing <u>Smith v. Philadelphia Hous. Auth.</u>, 107 F.3d 223, 225 (3d Cir. 1997). "If the prima facie case has been made, the opposing party bears the burden of producing record evidence that will contest this rate." <u>Id.</u> at 149. A hearing must be conducted if the reasonable market rates are in dispute. <u>Id.</u> In calculating an award of attorney's fees, "the current market rate must be used." <u>Id.</u> "The current market rate is the rate at the time of the fee petition, not the rate at the time the services were performed." <u>Id.</u> at 149-50.

### A. Counsel's Contentions Regarding Fee Calculation

As noted earlier, Counsel does not contest the reasonableness of the number of hours Defendants expended in attempting to dismiss the case after November 17, 2011.[32] Instead, he takes issue with the reasonableness of Defendants' hourly billing rates as well as the inclusion of the $4,591 in supplemental fees for Defendants' work in opposing his reconsideration motion.

---

[32] The Court independently has reviewed the number of hours expended in attempting to get the case dismissed after November 17, 2011, and finds that they are reasonable given the nature of the case and the complexity of the issues involved. <u>See</u> <u>Maldonado v. Houstoun</u>, 256 F.3d 181, 184 (3d Cir. 2001) ("In calculating the hours reasonably expended, a court should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary.") (citations and quotations omitted). The Court notes that it did exclude from the lodestar calculation "JAT"'s 02/01/12 and 02/02/12 entries indicating that 4.70 and 1.60 hours, respectively, were spent drafting a client report outlining the arguments raised in the summary judgment and sanctions motion. <u>See</u> (Doc. No. 72-9 at 22). The Court finds that it would be inappropriate to include in the award time spent formally apprising the client of the detailed arguments that were set forth in the motions since the client report was not filed with the Court and since such work arguably could be considered duplicative of the work they did preparing the actual motions. For the same reason, the Court also has reduced by half "CR"'s 02/03/12 entry indicating that 1.00 hour was spent (1) working on, revising, updating, and finalizing the client report and (2) addressing trial scheduling and motion oral argument issues with John Tartaglia. <u>See</u> (<u>id.</u>). The Court will adjust this entry to 0.50 hours in order to exclude the time spent working on the client report.

(Doc. No. 93 at 13; Doc. No. 94 at 2).   According to Counsel, local counsel's affidavit (Doc. No. 72-22 at 2) established that the reasonable hourly rate for the prevailing market was $195/hr for partners and $175/hr for associates.   See (Doc. No. 93 at 2).

In response to Counsel's argument regarding Defendants' failure to submit evidence sufficient to meet their burden of proving the reasonableness of their hourly rate, the Court ordered[33] Defendants to supplement the record with additional evidence demonstrating that their requested billing rates are reasonable for products liability defense cases in the local market.   In light of Defendants' compliance with the Court's January 22, 2013, Order, the Court finds that Counsel's argument is without merit.   See (Doc Nos. 96 & 97).   The additional evidence submitted by Defendants sets forth in detail the factors which justify their rates and includes the declarations of five products liability defense attorneys who have practiced in Pittsburgh, PA for a substantial number of years.   See (Doc. No. 96-1).   The Pittsburgh attorney declarations (1) set forth each attorney's experience and familiarity with the prevailing billing rates for products liability cases in Pittsburgh, PA and the Western District, (2) attest to the knowledge, experience, and reputation of New York Counsel and (3) confirm that the rates they sought were reasonable for products liability defense cases in the Pittsburgh market.[34]   Importantly, included among the Pittsburgh attorney declarations was a supplemental declaration from local counsel which explained that the hourly rates they charged for their services ($195/hr for partners and $175/hr for associates) "were based on [the firm]'s limited role and limited responsibility in handling the defense of this case and the client's specific request that local counsel services be rendered at a

---

[33] Though this Court believed that the requested rates were reasonable based on its 34 years on the bench and 55 years of legal experience *in toto*, it ordered Defendants to supplement the record out of an abundance of caution.

[34] The declarations specifically addressed the requested hourly rates of $295 for Chris Renzulli (partner) and $225 (2011) to $240 (2012) for John A. Tartaglia (associate).

rate that was lower than that which my office would have otherwise normally charged to defend a product liability action such as this." (Doc. No. 96-1 at 7). After reviewing these declarations, the Court is satisfied that Defendants have carried their burden of proving the reasonableness of their hourly rates in the prevailing market.[35] The Court therefore will use Defendants' billing rates in performing the lodestar calculation.

Turning to Counsel's objection regarding the inclusion of the $4,591 in fees for opposing the reconsideration motion, the Court finds that, under these particular facts, the supplemental fees should be included in the award given that they were only incurred because of Counsel's failure to disclose information that either was in his possession or accessible to him at the time he submitted his responses to the sanctions motion. The inclusion of these fees also is warranted because the evidence submitted in support of the reconsideration motion was unpersuasive and/or incredible, and, conveniently addressed, after-the-fact, every major ground the Court relied on in granting sanctions.

For example, in response to the Court's finding that Counsel's pre-filing investigation was unreasonable because he failed to have the gun inspected by a firearms consultant prior to filing suit, Counsel submitted evidence purporting to establish that he did, in fact, have the gun inspected shortly after the incident. See (Doc. No. 78-1). According to the Affidavit of Samuel J. Sero, a Professional Engineer, Plaintiff had a friend named Michael Anderson who was "associated" with Mr. Sero's office at the time of the incident. Mr. Anderson relayed to Mr. Sero that his friend had been "injured while utilizing a handgun that exploded" and inquired as to whether Mr. Sero knew of anyone capable of offering Plaintiff representation. (Id. at 1). Mr.

---

[35] The Court notes that Counsel has not come forward with any evidence disputing the reasonableness of the hourly rate following Defendants' submission of the supplemental declarations on February 6, 2013. A hearing to determine the prevailing market rate therefore is unnecessary. See Lanni, 259 F.3d at 149.

Sero referred Plaintiff to Counsel's firm and thereafter attended a meeting with Plaintiff,

Counsel, and another attorney from the firm to evaluate the firearm. (Id.). At this meeting, Mr.

Sero states that he "personally reviewed" the gun and "advised all persons present" that it was

"[his] opinion that the subject firearm had catastrophically failed due to an out of battery firing."

(Id. at 2). Mr. Sero then explained (1) what an out of battery firing is, (2) why he believed it was

the cause of the incident, (3) why the relationship between Michael Anderson and Plaintiff

precluded him from serving as their expert, and (4) why he advised Counsel not to bring his own

expert during Defendants' non-destructive examination of the firearm. (Id. at 2-3). The Court

notes that this meeting allegedly took place on April 18, 2007, five days after the incident and

**approximately one month before Williams had relinquished control of the gun and given it**

**to Plaintiff.** See (Doc. No. 78-2 at 2); William's Deposition (Doc. No. 61-1 at 105).

Interestingly, Counsel states that he relied on Mr. Sero's opinion in proceeding with his

defect claim. See (Doc. No. 78-2 at 2). This representation, however, is completely belied by

the record. For example, Counsel's October 17, 2007 claim letter to Defendants, which is the

first correspondence between the parties, indicates that Counsel originally believed the gun was

defective because of the materials used in the composition of the slide. See (Doc. No. 56-4).

The letter makes no mention of an out-of-battery firing and instead alleges an entirely different

defect. Specifically, it alleged that the gun was defective because of "the use of Zamak-3 in the

composition of the slide and otherwise, [which] caused the slide to deform during the normal

course of operation as to allow the cartridge casing and/or components of the firearm to

forcefully contact [Plaintiff's] thumb and hand." See (id.).

Indeed, Mr. Sero's affidavit purports to be evidence that Counsel obtained a preliminary

opinion from a firearms consultant that the gun was defective, but this evidence loses substantial

force in light of the claim letter, the fact that the out-of-battery firing theory was not alleged in the Complaint, and the fact that Mr. Sero's inspection was not disclosed during discovery -- particularly during the depositions[36] and in response to interrogatory questions which asked Plaintiff to "describe in detail any testing or inspection of the subject pistol by any person or entity acting on your behalf prior to and subsequent to the incident" and to "[i]dentify all persons who have had . . . access to the subject pistol in any way from the time it left defendants' control . . . ." (Doc. No. 88-2 at 4-5). Plaintiff only stated that the police trooper inspected the pistol after the incident and that it was now in the law firm's possession.[37]  (Id.). To be sure, the record does not reveal any discussion of an out-of-battery firing until Roane's July 9, 2010

---

[36] When asked if he spoke with anyone knowledgeable about firearms Plaintiff testified under oath that the only person he spoke with was an individual from a university who called to inquire whether he had altered the gun after the incident. See (Doc. No. 61-2 at 130). When they were asked to provide a list of people who saw the gun after the incident, Williams and Plaintiff made no mention of Mr. Sero. See (Doc. No. 61-2 at 163-64); See (Doc. No. 61-1 at 104-05).

[37] The fact that this preliminary evaluation was not disclosed until now is disconcerting, especially in light of the fact that Plaintiff verified *under the penalty of perjury* that the answers to the interrogatories were true and correct to the best of his knowledge. See (Doc. No. 88-2 at 6). If this meeting with Mr. Sero did in fact occur, then Counsel knowingly concealed and/or failed to disclose this material fact during discovery and he either advised his client to omit the evaluation from his responses, or, repeatedly failed to correct his client's omission of this fact throughout the litigation. The Court notes that the Code of Professional Responsibility of the American Bar Association (ABA) states that, "[i]n his representation of a client, a lawyer shall not: . . . (3) [c]onceal or knowingly fail to disclose that which he is required by law to reveal" or "(4) [k]nowingly use perjured testimony or false evidence." Disciplinary Rule (DR) 7-102 of the Code of Professional Responsibility. Counsel's proffered reason for not disclosing Mr. Sero's evaluation of the gun is far from compelling as he allegedly was attempting to protect his clients' interests since Mr. Sero's association with Plaintiff's friend would have provided Defendants with impeachment material at trial; he also states that he did not disclose this preliminary evaluation because he "did not appreciate that the interests of our clients and our interests had diverged." (Doc. No. 78-2 at 2). The Court is not persuaded by this excuse - Counsel was faced with a motion for sanctions based on his handling of the case and he should have known that his failure to come forward with this information earlier likely would lead to an adverse finding that would impact him personally. To be sure, Defendants' main argument in seeking sanctions was the fact that he failed to obtain any preliminary opinion that the gun was defective prior to filing suit. It therefore is unlikely that Counsel did not realize the disclosure of Mr. Sero's evaluation was necessary in order to avoid sanctions, even if it would have affected his trial strategy.

expert report which identified that as the cause of the incident. See (Doc. No. 39-4). Thus, the affidavit of Mr. Sero did not undermine the Court's finding that Counsel's pre-filing investigation was unreasonable, but rather, raised more questions than it answered.

The medical affidavit of Dr. Karl Williams, Medical Examiner, likewise was unavailing for a number of reasons, the most significant being that it is *irrelevant* in light of Counsel's confirmation that the projectile was, indeed, a bullet. In their opposition to the motion for reconsideration, Defendants provided the Court with a letter from Counsel dated January 23, 2008, where Counsel responded to Defendants' request for certain information. See (Doc. No. 88-4 at 3). In ¶ 6 of this letter, Counsel explained how the incident occurred, stating that "[t]he gun misfired and the **cartridge** came through the side of [Plaintiff]'s left hand. As a result, the **bullet** went through [Plaintiff's] hand breaking his thumb and he sustained an injury to his hand." (Doc. No. 88-4 at 3). This letter shows that Counsel's understanding was that a bullet went through his client's hand; the letter makes no reference to the "shrapnel theory," and only serves to reinforce the propriety of the Court's finding that the shrapnel allegation was lodged without reason to believe that it was well-grounded in fact and with objective evidentiary support.[38] Thus, even though this medical affidavit purports to establish that Counsel's shrapnel allegation theoretically had evidentiary support at the time it was made since medical records generally are "inaccurate," (See Doc. No. 82-3), whether the medical records actually were accurate in labeling Plaintiff's injury as a "gunshot wound" is of no consequence since the evidence shows that *Counsel knew* the projectile was a bullet since at least 2008, well before he ever filed suit.

---

[38] It also crystallizes Defendants' argument that the real allegation in this case involves a bullet discharging out of the left side of a firearm, without the trigger being pulled, with the slide open 0.5 inches to 0.75 inches (*i.e.* with the slide being open so wide that the gun was incapable of discharging any rounds).

Even if Counsel himself had not confirmed that the projectile was a bullet, the medical affidavit still is unpersuasive.  In his affidavit, Dr. Williams (1) discusses the general inaccuracies and unreliability of statements "regarding the mechanism of injury" in medical records, (2) states that he reviewed the medical records, the photographs of Plaintiff's injures, and the photographs of the subject firearm and (3) concludes that the evidence is insufficient "for one to make a conclusive scientific determination concerning whether the injuries sustained by Plaintiff were the result of a gunshot wound or were caused by fragments from the exploding firearm." (Doc. No. 82-3 at 4).  Dr. Williams, however, does not indicate the date that he reviewed this material and his affidavit does not prove that Counsel was relying on his medical opinion at the time he was lodging the shrapnel allegation.[39]

In ¶ 39 of Counsel's affidavit, he states that "[f]or an extended time period, and prior to the commencement of this litigation, medical care providers had informed me and other attorneys who I know that medical records indicating the cause of an injury, for example that an injury was caused by a gunshot wound, are often inaccurate and that a mistaken initial assumption often permeates subsequent medical records." (Doc. No. 78-2 at 7).  Counsel, however, does not state that he relied on Dr. Williams' opinion or any medical provider's opinion specifically in advancing the shrapnel allegation at the time he submitted the triggering documents with the Court.  This is evidenced by Counsel's briefs where he objected to the characterization of the injury in the medical records only on the basis of hearsay and reiterated that shrapnel could have injured Plaintiff's hand *since his client was unaware* of the exact nature of the projectile that went through his hand. (Doc. No. 61 at 10-13; Doc. No. 62 at 6; Doc. No. 66 at 6).  Furthermore, regardless of whether or not the medical records generally contain

---

[39] Counsel's affidavit likewise fails to indicate that Dr. Williams' review of the material occurred prior to his submission of his briefs.

inaccuracies, Plaintiff testified that the medical providers did not find any gun fragments in his hand. See (Doc. No. 61-2 at 95-96). Thus, Dr. Williams' medical affidavit does not prove that Counsel was relying on his medical opinion or any alleged knowledge regarding the general inaccuracies of physician statements in medical records at the time he was advancing the shrapnel allegation. Indeed, in light of the fact that the affidavit is dated **eleven days** after the Court issued its Order granting sanctions, a fair argument could be made that Counsel merely sought out a medical opinion after he was sanctioned in an attempt to justify his reliance on his client's characterization of his injury and make it appear as though his shrapnel allegation had objective evidentiary support at the time that it was made.

Finally, the evidence of "prior similar incidents" which Counsel submitted in an attempt to demonstrate that Hi-Point guns are capable of malfunctioning is equally underwhelming. See (Doc. No. 78-3 to 78-6, 78-8). These exhibits (1) discuss cheap firearms ("Saturday Night Specials") generally and note that the Hi-Point is considered to be among this category of firearms, (2) reflect images of other firearms that had malfunctioned for various reasons and caused some damage to the firearm, and (3) show that Defendants previously had been named in a lawsuit alleging an injury caused by a defective firearm. None of the exhibits or the pictures contained therein approach the type of allegation that was presented here, nor do they remotely reflect the same kind of gun damage. The only pictures in the record that contain nearly identical damage to the incident firearm are the ones of the test pistol that Defendants shot with another firearm, as evidenced by Roane's inability to distinguish between them. See (Doc. No. 56-16).

Counsel essentially used the Court's opinion as a roadmap and attempted to introduce evidence after-the-fact which, in addition to being unpersuasive and incredible, purported to undermine the Court's findings as to the reasonableness of his investigation of the case.

31

However, the "new" evidence that was presented in connection with Counsel's reconsideration motion only reinforces the propriety of sanctions in this case because it provides further support for the Court's finding that Counsel filed documents which contained allegations not reasonably believed to be well-ground in fact and with evidentiary support. Defendants should not be forced to bear the costs they incurred responding to a motion that would not have been filed if Counsel had simply submitted the information at the relevant and appropriate time. Defendants therefore should be compensated for the time and effort that was spent addressing the arguments and exhibits raised in that motion. To be sure, the fees directly and unavoidably resulted from the improper filing; if there was no improper filing, the Court would not have granted sanctions and there would be no reason to seek reconsideration.

### B.  Actual Fees and Costs Incurred Since November 17, 2011

The Court now turns to the actual lodestar calculation. After independently performing the fee calculation, the Court finds that the total the amount of actual attorney's fees and costs that Defendants incurred as a result of Counsel's improper filings after November 17, 2011, is $35,849.35.[40]  This figure represents the following:

### FEES

| Attorney | Hours | Rate | Lodestar |
|---|---|---|---|
| Christopher Renzulli ("CR") NY Partner | 22.4 | $295 | $6,608.00 |

---

[40] This figure represents the actual fees and costs incurred between November 17, 2011 and February 3, 2012. See (Doc. No. 72-9 at 22). According to the fee petition, February 3, 2012 represents the last date that work was performed in connection with the pending motions that Defendants had filed. See (id.)  As a result, the Court has excluded the $17.20 photocopying charge incurred on 02/29/12. See (id.).

| | | | |
|---|---|---|---|
| John A. Tartaglia ("JAT")<br><br>NY Associate | 2011: 37.8<br>2012: 38.4 | 2011: $225<br>2012: $240 | 2011: $ 8,505.00<br>2012: $ 9,216.00<br><u>Total</u>: 17,721.00 |
| Samantha Gilbert ("SG")<br><br>NY Paralegal[41] | 2.7 | $125 | $337.50 |
| ("CO")[42]<br><br>NY Paralegal | 4.5 | $125 | $562.50 |
| Stephen J. Dalesio ("SD")<br><br>Local Partner | 0.20 | $195 | $39.00 |
| Gregory Scheuring ("GS")<br><br>Local Associate | 3.3 | $175 | $577.50 |

## **LODESTAR CALCULATION**

- **FEES**:   $25,229 (NY Fees) + $616.50 (Local Fees)[43]  = $25,845.50 in total actual fees

---

[41] Although Chris Renzulli's Declaration indicates that "SG" was billed out at a rate of $100/hr, <u>see</u> (Doc. No. 72-21 at 2), the invoices clearly show that she was billed at a rate of $125/hr.  <u>See</u> (Doc. No. 72-9 at 14, 16-17).  The Court therefore will use the $125 rate in its lodestar calculation.

[42] The timekeeper "CO" is an unidentified biller; however, the Court will assume that he/she is a paralegal since he/she was billed at a rate of $125, the same rate as "SG" who was identified as a paralegal.  <u>See</u> (Doc. No. 72-21 at 2; Doc. No. 72-9 at 15, 18).

- COSTS: $1,461.80 (NY Costs) + $1.05 (Local Costs)[44] = $1,462.85 in total actual costs[45]

  o **$25,845.50 + $1,462.85 = $27,308.35 in Total F&C from 11/17/11 to 02/03/12**

→ **$27, 308.35 + $ 3,950.00[46] + 4,591.00[47] = $35,849.35 in Total Fees & Costs**

## IV.   Equitable Considerations

The Court has determined that Defendants incurred a total of $35,849.35 in actual fees

and costs between November 17, 2011 and February 3, 2012 attempting to get this case

dismissed after Counsel filed the Amended Pretrial Statement. The Court's final task is

determining the reasonableness of this amount in light of the circumstances, after taking into

account various equitable considerations. See Doering, 857 F.2d at 195 ("Where a district court

decides to award a monetary sanction, such as attorney's fees, the total amount of such a sanction

. . . should be guided by equitable considerations."). In order to determine what constitutes a

---

[43] This figure represents the local fees incurred from 11/17/11 to 02/03/12. See (Doc. No. 72-22 at 4-5, 8-9).

[44] See (Doc. No. 72-22 at 9).

[45] This figure represents the total costs incurred from 11/17/11 to 02/03/12. See (Doc. No. 72-9 at 18, 22).

[46] This figure represents the amount of fees "CR" and "JAT" incurred in preparing the fee petition and supporting material. See (Doc. No. 72-21) (CR – 2hrs X $295/hr = $590; JAT – 14hrs X $240/hr = $3,360). The Court notes that Counsel did not object to the inclusion of these fees in the calculation. It also notes that these fees are compensable since preparation of the fee petition constitutes work performed directly as a result of the improper filing. See Tutu Wells Contamination Litigation, 120 F.3d 368, 387 (3d Cir. 1997) ("The time, effort, and resources expended in bringing sanctionable conduct to light would have been unnecessary had the sanctionable conduct never occurred."). The Court notes that the fee petition includes 22 exhibits, is detailed and organized, and sets forth extensive argument in relation to what the appropriate amount of sanctions should be. See (Doc. No. 72). The Court therefore finds that the number of hours expended in preparing the petition is reasonable and should be included in the award.

[47] This figure represents the amount of fees Defendants incurred in opposing Counsel's motion for reconsideration. See (Doc. Nos. 91 & 91-1) (CR – 1hr X $295/hr = $295; JAT – 17.9hrs X $240/hr = $4,296).

34

*reasonable* fee award under the circumstances, the Court must first consider a number of factors, including but not limited to: (1) ability to pay, (2) "adverse press scrutiny" (3) history of disciplinary action/similar conduct vs. good reputation, (4) degree of frivolousness, (5) Defendants' need for compensation, and (6) degree of willfulness. See Doering, 857 F.2d at 197. In considering these factors, the Court must bear in mind that a Rule 11 sanction need only be the "*minimum* that will serve to *adequately* deter the undesirable behavior." Zuk v. E. Pa. Psychiatric Inst. of the Med. Coll. Of Pa., 103 F.3d 294, 301 (3d Cir. 1996). The Court notes, however, that what constitutes the "minimum" is largely dependent on the nature of the conduct underlying the Rule 11 violation and the degree to which these mitigating factors apply.

The Court has considered Counsel's ability to pay as well as his firm's ability to pay and finds that the amount imposed will not cause a significant hardship as the firm's tax returns indicate that it nets a sufficient amount of income to comply with the amount imposed. The Court also finds that Counsel will be able to pay his share with his salary notwithstanding his financial obligations. The Court also has considered the fact that: (1) this is the first time that the firm and Counsel have been sanctioned, (2) they have no prior history of any disciplinary proceedings, ethics violations, or malpractice suits, (3) there will be no insurance coverage for the sanctions award, (4) the Court did not find a Rule 11(b)(1) violation,[48] (5) Counsel and/or the firm are paying attorney's fees for their own representation in resolving this matter, and (6) the Opinion was picked up for publication which resulted in some negative online publicity.[49] The

---

[48] A Rule 11(b)(1) violation occurs when a document is presented for an improper purpose, "such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed.R.Civ.P 11(b)(1) (2012).

[49] In his response to Defendants' fee petition, Counsel attached as exhibits a few online articles discussing the case and the fact that Counsel was sanctioned. See (Doc. No. 93-4 at 5-12).

Court finds that these equitable considerations justify reducing the award from $35,849.35 to $20,000.

## V.    **Conclusion**

The Court has carefully considered whether and to what degree sanctions in this case were warranted. The Court is troubled by Counsel's conduct, especially in light of the recent revelation regarding Mr. Sero's preliminary inspection. The Court must consider what suffices to deter not only Counsel's future conduct, but the comparable conduct of those similarly situated as well. Therefore, the Court finds that a sanction award of reasonable attorney's fees and costs in the amount of $20,000 against Counsel and his law firm is equitable and appropriate after considering the circumstances surrounding the triggering documents and the actual fees Defendants incurred as a result of Counsel's Rule 11 violation. The Court has downward adjusted the amount to take into account the equitable considerations which militate against an award of actual attorney's fees in the amount of $35,849.35. Although Counsel and his firm are jointly and severally liable for the entire amount imposed, the Court apportions $5,000 against Counsel and $15,000 against his firm and directs that payment be made to Defendants within 90 days or within a time-frame that is mutually agreeable to the parties. The Court does not find that this sum is so substantial that it may result in financial ruin or frustrate the purpose of Rule 11.

An appropriate Order will be issued.


Date: <u>February 26, 2013</u>                    s/Alan N. Bloch
                                                 United States District Judge


ecf:    Counsel of record

36